Argued May 7, affirmed August 12, 1971

ELIZAGA, *Respondent, v.* KAISER FOUNDA-
TION HOSPITALS, INC. ET AL, *Appellants.*

487 P2d 870

In Banc

*William L. Hallmark,* Portland, argued the cause for appellants. With him on the briefs were McMenamin, Jones, Joseph & Lang, Portland.

*Julia L. Boston,* Portland, argued the cause and filed a brief for respondent.

DENECKE, J.

This is an action at law to recover damages for misrepresentation. Defendants appeal from a judgment entered on a jury verdict for $4,500.

Defendant established a surgical preceptorship in 1962. The preceptorship was a training program recognized by the American Board of Surgery.

On April 20, 1965, the Board of Medical Examiners of the State of Oregon sent defendant a letter stating that it renewed its approval of the preceptorship program until June 30, 1966, but that the program would not be approved beyond that date. Defendant wrote to the Board of Examiners seeking an extension of the program so that defendant would have the necessary time to apply for a residency program. The Board of Examiners granted this request and extended the preceptorship until June 30, 1967. Defendant then applied for a four-year residency program.

On February 6, 1967, defendant was notified that the Board of Medical Examiners had approved defendant's request to continue the preceptorship. The letter did not mention an expiration date for this approval. About three months later defendant learned that its request for a four-year residency program had

been denied because the American Medical Association was not interested in creating any new programs.

The Board of Medical Examiners notified defendant on July 25, 1968, that the approval of the preceptorship given in January 1967 had ended as of July 1, 1968, and the program was, therefore, terminated. Defendant requested a continuation of the preceptorship and stated its intent to seek an approved residency program. The Board of Examiners approved the request but stated in its letter to defendant that "the extension shall expire on June 30, 1969." The Executive Secretary to the Board of Medical Examiners testified that at this time defendant received no indication that this extension would be renewed; instead, the indications were that the preceptorship "would definitely terminate as of June 30th, 1969."

As mentioned, the preceptorship was designed to be part of a program leading directly to certification with the American Board of Surgery. Defendant, however, occasionally hired foreign medical students as preceptees. These students had foreign residency training. Defendant would hire them if it considered their training adequate even though the American Board of Surgery normally would neither recognize their residencies nor give credit for their preceptorships towards certification. As a member of an approved training program, however, these preceptees were normally given a temporary license by the Oregon Board of Medical Examiners.

In 1967 plaintiff, a citizen of the Philippines, applied for a preceptorship with defendant. He had attended medical school, performed his internship, and served a five-year surgical residency in the Philippines. After receiving a favorable response, plaintiff

wrote to defendant and sought specific reassurance about his qualifications for the position and a temporary Oregon license. Defendant assured plaintiff that he was qualified for the program and a license and then offered him a position. He was unable to accept this offer because of difficulties in obtaining a visa. Both parties, however, remained in contact. In January 1969 after plaintiff obtained a visa, defendant offered him a position starting July 1, 1969. It should be noted that defendant made this offer five months after the final extension of the preceptorship by the Board of Examiners in August 1968. Plaintiff accepted defendant's offer and, after notifying defendant of his plans, immediately moved his family to Portland.

In April 1969 the Board of Examiners stated that pursuant to its decision of August 1968 its approval of the preceptorship would end as of June 30, 1969. The Board advised defendant that for this reason it would no longer issue temporary licenses to surgical preceptees. Defendant then notified plaintiff that he could not be hired and he should look elsewhere for employment. He eventually found a position as an intern at about half the salary he would have received as a preceptee.

1. Plaintiff brought this action alleging that defendant's offer of a preceptorship for July 1, 1969, constituted a misrepresentation. Defendant's principal assignment of error is that the trial court erred in denying its motion for a directed verdict. The first contention is that there was no evidence of misrepresentation. It is recognized that nondisclosure of material facts can be a form of misrepresentation where the defendant has made representations which would be misleading without full disclosure. Prosser,

Torts (3d ed) 711. A good example of this principle is the case *Andolsun v. Berlitz Schools of Languages of America* (DC App), 196 A2d 926 (1964), in which a trial court finding of no misrepresentation was reversed. The plaintiff, an alien, was hired by defendant to work as an interpreter for the U. S. Army. During the preliminary interview plaintiff asked if his alien status would affect his qualifications for the job. The interviewer gave the technically correct answer that aliens were qualified for the job. Before plaintiff signed his contract, however, this policy was brought under review by the Army and shortly after starting the job plaintiff was released. The court held that in light of plaintiff's specific inquiry about his alien status, the failure to disclose the pending change of policy constituted a misrepresentation.

2. The facts of this case are really quite similar. Plaintiff made it clear in his correspondence that he was concerned about whether he would qualify for the preceptorship. Defendant assured him that he would and then offered him a position. When taken as a whole, a jury could find that these negotiations amounted to a representation that the preceptorship would continue after June 30, 1969. In order to avoid misleading plaintiff, defendant was under a duty to disclose the fact that the Board of Examiners might well terminate the program.

3. Defendant's next argument is that even if there was a misrepresentation, there was no evidence of defendant's intent to mislead. The requisite intent to mislead consists of a defendant misrepresenting a material fact for the purpose of misleading the other party or with the knowledge he is misleading the other party or in reckless disregard of the fact he is mis-

leading the other party. Prosser, Torts, supra, at 715-719. As discussed, the record in this case contains evidence of the following. The Board of Medical Examiners had questioned the continuation of the preceptorship for a number of years. In 1965 the Board stated its intention to terminate the program as of June 30, 1966. Defendant obtained an extension for a year, partly because of its express intention to obtain an approved residency program. The residency, however, was not forthcoming. In the summer of 1968, after an additional extension, defendant was told that its program had terminated in fact. Defendant obtained one final extension, but at this time the indications were the program would end on June 30, 1969. In spite of these facts, defendant offered plaintiff a job without disclosing that the program would probably terminate June 30, 1969. Morever, defendant persisted in its nondisclosure after learning that plaintiff intended to come to Portland well before the job was to begin. We hold that in light of all this evidence a jury could conclude that defendant knew the preceptorship probably would not be renewed; that defendant nevertheless offered plaintiff a job beginning July 1, 1969; and that plaintiff accepted the offer with the firm belief there would be a job for him. Under these facts a jury could also decide that the misrepresentation produced by the failure to disclose was done in reckless disregard of the fact plaintiff was being misled.

4. A failure to perform a promise is not a basis for an action for fraud. Making a promise, however, with the knowledge that it probably cannot be performed or with reckless disregard whether the promissor can or cannot perform can be the basis for an action of fraud. Prosser, Torts, supra, at 745.

Defendant's final contention is that the court

erred in its instruction to the jury on damages. The defendant requested the following:

> "If you find for the Plaintiff, I instruct you that the measure of damage in this case is that amount of money which would restore the Plaintiff to the condition that he was in prior to the fraudulent representation."

The request was taken from that part of *Bridgmon v. Walker,* 218 Or 130, 135, 344 P2d 233 (1959), which states that if "the defrauded party elects to disaffirm the contract, his remedy lies in restoration to his former position." The plaintiff in this case did not elect to disaffirm; so this language from *Bridgmon v. Walker,* supra, is inapplicable.

The court instructed the jury that if they found the plaintiff had been defrauded, "then the measure of damage would be that amount of money which would compensate the plaintiff for the actual salary loss he has suffered as a result of the deceit."

Defendant contends that because of the instruction given and the requested instruction refused, the trial court submitted the case on "the benefit of the bargain" theory rather than the "out of pocket" theory, and this was error.

5, 6. Under the "benefit of the bargain" rule, the purchaser may recover as damages the difference between the real value of the property purchased and the value it would have had if it had been as represented. Under the "out of pocket" rule the damages are the difference between the real value of the property purchased and the price the purchaser paid. *Sorenson et ux v. Gardner et ux,* 215 Or 255, 264-265, 334 P2d 471 (1959).

7. A statement of these two measures of damages is sufficient to show that they are inapplicable to a case of a fraudulently induced employment contract. In this case there is no "real value" of the compensation to be paid. There is the amount plaintiff would have earned under the contract, and the amount plaintiff actually earned.

8, 9. If this had been an action for breach of an employment contract, the measure of damages would have been undisputed. Damages in such a case is the difference between what the plaintiff did earn and what he would have earned under the contract. 11 Williston, Contracts (3rd ed) 302, § 1358; McCormick on Damages 625, § 158. This same measure of damages was applied in an action for a fraudulently induced employment contract. *Andolsun v. Berlitz Schools of Languages,* supra, (196 A2d 926). We conclude it is a proper measure of damages in this case. See Annotation, Measure of Damages for Fraudulently Inducing Employment Contract, 24 ALR3d 1388 (1969). This might be considered as using the "benefit of the bargain" rule because the plaintiff gets the benefit of the salary he bargained for but, as shown by the statement of the rule, that is not what is normally meant by "benefit of the bargain."

Affirmed.