Argued and submitted April 2, affirmed July 21,
reconsideration denied September 2,
petition for review allowed September 21, 1982 (293 Or 634)

# WEDGWOOD HOMES, INC. et al,
*Respondents,*

*v.*

# LUND,
*Appellant.*

## (No. 40-069, CA A20839)

648 P2d 393

Dennis E. Stenzel, Portland, argued the cause for appellant. With him on the briefs was Chernoff & Vilhauer, Portland.

Milton C. Lankton, Portland, argued the cause for respondents. With him on the brief was Black, Kendall, Tremaine, Boothe & Higgins, Portland.

Before Richardson, Presiding Judge, and Thornton and Van Hoomissen, Judges.

RICHARDSON, P. J.

## RICHARDSON, P. J.

Plaintiffs brought this action to enjoin defendant from using plaintiffs' business name "Wedgwood" in connection with defendant's businesses. Plaintiffs contend that defendant's use of the name constitutes common law unfair competition and violates Oregon's "antidilution statute," ORS 647.107. Defendant appeals from the trial court's decree enjoining him from using the name in eastern Washington County. We affirm.

We agree with the trial judge's factual findings and adopt the statement of facts from his memorandum opinion:[1]

"Plaintiffs are Oregon corporations which have been engaged for approximately 25 years in the development, construction and marketing of residential real estate in the Portland Metropolitan area and primarily within eastern Washington County. Plaintiffs' construction projects have included, residential single family, apartments, multiple dwellings such as duplexes, and condominiums. As an adjunct to their business activities, plaintiffs have spent substantial sums of money on advertising programs to engender in the consumers' minds a connotation that Wedgwood Homes equates with residential construction that has quality, styling and flair. While plaintiffs do from time to time have rental units available, the primary thrust of their business endeavors has been new home (be it single family or multiple) construction and sale. The sales market plaintiffs are primarily interested in are people in the 30 - 50 age group, although certain of their developments such as Westbrook are populated by a good number of people who are retired.

"Plaintiffs are not now nor have they ever been in the business of providing retirement home care for the elderly.

"There are many people in eastern Washington County as well as those engaged in real estate sales who consider the word Wedgwood to be synonomous with plaintiffs activities in real estate development, construction and sales.

---

[1] The trial court's memorandum opinion has been of great assistance to us, as have the parties' briefs. Defendant's briefs, in particular, present a cogent and comprehensive analysis of the relevant law.

"Defendant has used the word Wedgwood in his retirement apartment business in eastern Washington County since 1977. Defendant has two places of business within plaintiffs' marketing area; they are commonly referred to as Wedgwood Downs and Wedgwood Place. These operations cater exclusively to retirement care for the elderly. They are not nursing homes, nor are they owner occupied or typical residential multi-family homes or apartments. Both Wedgwood Downs and Wedgwood Place could be most likened to a dormitory type situation for elderly people who are still ambulatory and semi-independent. The average age of defendant's tenants is 83. Defendant only seeks tenants who are age 65 or older. In addition to providing housing for a monthly fee, defendant also provides three meals a day, transportation, maid and linen service, entertainment, special diet service, beauty salon service, an emergency intercom system, special tray service for tenants who are ill for a few days, and weekly religious services. One of the prerequisites for a person desiring to be a tenant of defendant's facilities is medical approval by the applicant's treating physician.

"Both Wedgwood Downs and Wedgwood Place are single use type facilities with special design features such as sinks, refrigerators and toilets built higher to accomodate elderly people, panic bars, and individual air conditioning units for each tenant's room.

"In the past eighteen months, out of an average of 20 to 50 incoming telephone calls per day at their main office, plaintiffs have received a total of 30 to 35 calls they believed to be for defendant's facilities, or tenants located therein. Some of these calls may have been for a local medical clinic because of similarity between the clinic and the plaintiffs' telephone numbers. In early 1978 plaintiffs' 'Four - Seasons' development sales office received several calls inquiring about Wedgwood Downs. There is no indication however, that plaintiffs suffered a loss of business due to these calls.

"Plaintiffs have also erroneously received five or six bills from suppliers of goods and services to defendant. Some of these suppliers have also provided goods and services to plaintiff in the past. * * *

"There is no indication that defendant's facilities had ever received telephone calls or mail intended for plaintiffs.

"Several witnesses testified that they believed there was a connection between plaintiffs' residential home building operations and defendant's retirement homes. Present owners of Wedgwood Homes who believed there was such a connection stated they would not be deterred from purchasing a Wedgwood Home because of the assumed affiliation.

"While there was evidence that one potential customer of plaintiffs' had suffered some initial confusion concerning the location of one of plaintiffs' subdivisions, there was no evidence of any actual loss of customers or diversion of business resulting from defendant's retirement home operations.

"* * * * *

"Defendant's retirement home operations are not in the business of residential home construction, development or sales.

"Defendant has registered the assumed business names Wedgwood Downs Retirement Apartments and Wedgwood Place Retirement Inns with the Oregon Corporation Commission."

The trial court concluded that plaintiffs have acquired a secondary meaning in the name Wedgwood in the eastern Washington County area. However, the court concluded that plaintiffs were not entitled to relief on their unfair competition claim, because they did not prove that defendant's use of the name is likely to cause confusion of source in the market.[2] *See Western Bank v. Western Bancorp.,* 47 Or App 191, 617 P2d 258 (1980). The trial court agreed with plaintiffs that defendant's use of the Wedgwood name was a "dilution" within the meaning of and gave rise to a right to injunctive relief under ORS 647.107, which provides:

---

[2] Plaintiffs argue on appeal that they are entitled to relief on their unfair competition as well as their statutory claim. Defendant argues that plaintiffs cannot rely on the unfair competition theory here, because the trial court decided that issue adversely to plaintiffs and plaintiffs have not cross-appealed. Defendant is incorrect. Plaintiffs do not contend that they are entitled to relief greater than the trial court gave; their argument is that there is an alternative ground for affirming the decree. *See Artman v. Ray,* 263 Or 529, 501 P2d 63, 502 P2d 1376 (1972). However, we conclude that the trial court correctly decided that there was no likelihood of confusion and, therefore, correctly rejected plaintiffs' unfair competition theory as a basis for relief.

"Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under ORS 647.015, or a mark valid at common law, or a trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services."

Although ORS 647.107 has twice been construed by the United States District Court, *beef & brew, inc. v. BEEF & BREW, INC.,* 389 F Supp 179, 185 PQ 531 (D Or 1974), *Airwick Industries, Inc. v. Alpkem Corporation,* 384 F Supp 1027, 184 PQ 771 (D Or 1974), the meaning of the statute is a question of first impression for the state's appellate courts. Axiomatically, the federal court's interpretation may be persuasive but it is not controlling.

Defendant argues that, in light of the legislative history of ORS 647.107 and of judicial interpretations of similar or identical statutes of other states, the Oregon statute should be construed to apply only to marks or names that are unique, coined or famous, *e.g.,* KODAK, PHILCO, AUNT JEMIMA. The two federal court opinions construing ORS 647.107 appear to lend some support to defendant's view. In *Airwick Industries,* Judge Burns noted, in discussing a preliminary issue:

"With respect to the strength or weakness of Plaintiff's stylized A and combination of the names 'Air' and 'kem' into 'Airkem,' I am convinced that the stylized A or triangular mark is particularly weak and the combination name is only slightly less weak. Plaintiff's chosen name is descriptive—'Air' for the odor reactant aspect of its business, and 'kem' to connote the use of chemicals as odor reactants, disinfectants, etc. This sort of non-whimsical association is entitled to only limited legal protection. Nor was there at the trial a preponderance of evidence that would justify a finding or conclusion of secondary meaning that produces, legally, a likelihood of confusion." (Footnote omitted.) 384 F Supp at 1031.

Later, in its discussion of ORS 647.107, the court stated:

"In order for something to be diluted, it must be distinctive. And, as already noted, I am of the opinion that the trademark and name at issue are particularly undistinctive. Furthermore, the Court of Appeals for this District

has been restrictive in construing an identical statute in California, Cal. Bus. & P. Code § 14330, both before and after Oregon's adoption of it in 1971.

"In the *Carter-Wallace [, Inc. v. Procter & Gamble Company,* 434 F.2d 794, 167 PQ 713 (9th Cir 1970)] case, even though the Plaintiff submitted evidence of a national survey indicating that approximately one out of every four consumers questioned associated its mark 'ARRID' with the slogan 'To Be Sure,' the Ninth Circuit held that the absence of evidence concerning confusion between Defendant's brand 'SURE' and the sources of the two products was enough to uphold the District Court's denial of relief. While noting that a Seventh Circuit case, Polaroid Corp. v. Polaraid, Inc., 319 F.2d 830, 837 [138 PQ 265] (1963), had found that an anti-dilution statute could go beyond the common law protection afforded in unfair competition theory 'by dispensing with the need for showing likelihood of confusion,' *Carter-Wallace,* supra, 434 F.2d at 803, this Ninth Circuit panel agreed with the District Court that the marks involved here [sic] were so common in the industry that the Plaintiff could not make out *any* dilution claim. The *Coffee Dan [, Inc. v. Coffee Don's Charcoal Broiler,* 305 F Supp 1210, 163 PQ 602 (N D Cal 1969)] case, was cited as an instance of lower courts having:

" '. . . [refrained from giving the California statute an] overly broad application "lest it swallow up all competition in the claim of protection against trade name infringement." ' Coffee Dan's, Inc. v. Coffee Don's Charcoal Broiler, 305 F.Supp. 1210, 1217 n. 13 (D.C. [sic] 1969). [Brackets theirs.]

"I conclude under the facts in this case that the descriptive syllables 'Air' and 'kem' and the triangular 'A' in this case are similarly weak so as not to deserve judicial enforcement of their exclusive use by Plaintiff, at least by forbidding Defendant from using its name and triangular mark. Both parties here solicit accounts through personal contact with purchasers—Plaintiff is known for its high quality merchandise in air purifiers and Defendant is known in a comparable fashion for its fine professional production of blood testing materials. Defendant's already-attained stature in its field makes any injury to Plaintiff's business reputation highly unlikely. See King Research, Inc. v. Shulton, Inc., 324 F.Supp. 631, 639 [169 PQ 396] (S.D.N.Y. 1971), 454 F.2d 66 (2 Cir. 1972).

"Recently, the Ninth Circuit again had occasion to consider a dilution claim in conjunction with a trademark infringement case. Plaintiff sought protection for the use of 'Playboy,' 'The Playboy Club,' and 'Playmate;' the Defendant promoted and operated nightclubs under the names 'Playgirl,' 'Playgirl Club' and 'Playgirl Key Club.' Because the substantive details of the Defendant's business were readily distinguishable from the Plaintiff's, the district court's decision in favor of the Defendant on all counts was affirmed. In rejecting the Plaintiff's dilution theory, the Court concluded:

" 'We have been shown no cases which have afforded protection under the California statute in circumstances such as those before us now; we agree with the district court that plaintiffs are not entitled to relief under any theory of dilution.' [*HMH Publishing Co., Inc. v. Lambert,* 482 F2d 595, 599, 178 PQ 518 (9th Cir 1973)]." (Emphasis in original.) 384 F Supp at 1032-33.

*See also beef & brew, inc. v. BEEF & BREW, INC., supra,* 389 F Supp at 186-87.

The federal court's interpretation of the Oregon statute appears to turn in part on two factors—absence of confusion of source and differences between the parties' business activities—which the statute *expressly* make immaterial.[3] More basically, the court's opinion *suggests,* as defendant argues here, that ORS 647.107 applies only to cases where the mark or name *itself* is particularly strong.

Whether that view is correct depends on the meaning of the phrase "distinctive quality" in the statute. Plaintiffs' understanding of the phrase contrasts sharply with the narrow interpretation defendant would have us give the statute. Plaintiffs argue, relying on *Ferrara v. Scharf,* 466 F Supp 125, 204 PQ 118 (SD NY 1979), and other cases:

"* * * 'Distinctiveness' within the meaning of the dilution statutes has been found in marks which are not particularly famous *and to names which have acquired*

---

[3] Defendant cites other cases holding that confusion of source is a consideration in determining whether relief is available under statutes identical to ORS 647.107. With deference to the courts that have so concluded, we cannot read the Oregon statute's express language that confusion is not a relevant factor to mean anything but what it says.

*distinctiveness only because they have acquired secondary
meanings. \* \* \*"* (Emphasis plaintiffs'.)

■ The words "distinctive quality" do not connote to
us only the high degree of strength or renown that defen-
dant contends a name must have to be protected by ORS
647.107. Moreover, if the statute does have such a limited
application, we cannot understand why the legislature
enacted it; the only persons who could avail themselves of it
would be those who are *peculiarly* well protected by the
common law remedy. For instance, defendant gives
KODAK as an example of the very limited class of names
to which the antidilution statute should apply. If someone
unaffiliated with the owner of the KODAK name were to
open a chain of restaurants called "Kodak's Burgers," the
owner of the name would have an excellent chance of
prevailing in an unfair competition action. There is no
condition precedent to the bringing of such an action that
the parties be in competition or potential competition.
*Milgrim Bros. v. Schlesinger,* 168 Or 476, 123 P2d 196
(1942).

Normally, it would be difficult to prove confusion
of source where the appropriator and the owner of the
name are not competitors or potential competitors or per-
sons who engage in the same or similar business activities.
Consequently, it normally would be difficult for the owner
to prevail against a noncompetitor under the common law
theory, which requires proof of likelihood of confusion.
That difficulty would be diminished or aiminated, how-
ever, where the owner's name is as famous as thaKODAK
name. The average person seeing the name at the restau-
rant would be likely to associate the name and the product
with the same entity whose name he has seen at the caera
shop.

Defendant indaates that the legislative intent
underlying ORS 647.107 and judicial interpretations of
similar statutes contemplate a very limited application of
the protectan against dilution baause of the anticompetitive
effects of that protection. *See The 88ᵉ Stores, Inc. v.
Martinez,* 227 Or 147, 167-69, 361 P2d 809 (1961). We agree
that the effect of the statute, like the effect of the common
law unfair competition remedy, is anticompetitive.

However, we find nothing in the language of ORS 647.107 that limits its anticompetitive benefits to the narrow class of marks and names defendant argues the legislature sought to protect.

 We recognize that the purposes of the common law remedy and of the antidilution statute differ and that there is a persuasive policy argument for not interfering as drastically with free competition to protect against dilution as to prevent infringement and "palming off." The court stated in *The 88* Stores, Inc. v. Martinez, supra:*

> "* * * The persuasive function of the symbol alone (i.e., the power which the symbol has, without reference to its source, to influence the purchase of the product) is not generally protected by the courts. * * * We are of the opinion that protection should be so limited. The ethical notion that one should not reap where he has not sown * * * is overridden by the need to maintain competition among sellers by permitting freedom of entry into the market. Accordingly, monopolies should be fostered only to the extent provided by way of patents and copyrights and under the law of unfair competition as it is applied in most jurisdictions requiring that confusion of source be shown. * * *" (Citations omitted.) 227 Or at 168.

However, *Martinez* was decided before ORS 647.107 was enacted, and the policy the court rejected there has now been adopted by the legislature. Although some courts have apparently done so in construing antidilution statutes (*see* n 3, *supra*), we cannot *limit* a statute's application by construction simply because we might disagree that the policy it embodies should have *any* application. We conclude that the language of ORS 647.107 does not support the limited application defendant argues that the legislature intended.

As plaintiffs point out, the legislature chose the word "distinctive" to define the names and marks it sought to protect against dilution and did not choose such alternative defining terms as "unique," "coined" or "famous." We agree that the statutory term "distinctive" applies to names which have become distinctive through secondary meaning as well as names which are inherently distinctive. We also agree that plaintiffs have acquired a secondary

meaning in the name Wedgwood in their eastern Washington County market.[4]

■ ■ In the trial court, defendant pleaded the affirmative defense of unclean hands, because plaintiffs had themselves appropriated the Wedgwood name from Josiah Wedgwood and Sons, Ltd., the manufacturer of Wedgwood china. Defendant argues on appeal that the name Wedgwood was almost universally associated with the china manufacturer and various other entities long before plaintiffs began using the name and that we should not apply the antidilution statute to benefit "a person who has himself copied the mark and whose own use amounts to a dilution of the value of the mark to its original owner." Neither Josiah Wedgwood nor his successors are parties to this action. While we do not suggest what our holding would be if they were parties, it is at least conceivable that they would be entitled to an injunction under ORS 647.107 against both plaintiffs and defendant. Defendant's argument has no bearing on the interest or right to protection *these parties* have in the name Wedgwood.

Defendant also argues:

"All of the famous marks brought to the attention of the Legislative Assembly were famous nationally or internationally and not in one half of one county of a single state. One need not strain one's imagination to envision the consequences of recognizing 'fame' on so local a basis. Should there be a 'Wedgwood' flowershop for example within the eastern one-half of Washington County which adopted its name before plaintiffs and which was well known in a four square block area of eastern Washington County, presumably the court would be compelled to enjoin Wedgwood Homes from advertising or otherwise using the Wedgwood name in such a four square block area.

---

[4] Generally speaking, proof of secondary meaning is necessary *in unfair competition cases* only when the name in which a protectible interest is claimed is descriptive, generic or common. *See Frostig v. Saga Enterprises, Inc.*, 272 Or 565, 570, 539 P2d 154 (1975); *Western Bank v. Western Bancorp., supra,* 47 Or App at 194. Proof of secondary meaning is of course permissible in other contexts when it is relevant, although "*secondary* meaning" is something of a misnomer when the fact proved is simply that a business name is widely known rather than that the words comprising the name have become widely perceived as "meaning" a particular business as well as carrying their literal meaning.

"From an examination of the legislative history of the Oregon statute and from the discussions of the commentators it is clear that 'fame' is understood to mean at least state-wide but more probably national or international fame."

There is logic to defendant's point. If the name Wedgwood is "distinctive" and is associated with fine china throughout the world, there is at least a conceptual problem with the notion that the name carries a different distinctive association in the small part of the world that concerns us here. However, we have concluded that names are "distinctive" for purposes of ORS 647.107 if they have acquired secondary meaning. A name can of course obtain secondary meaning in a limited area. *See Western Bank v. Western Bancorp., supra,* 47 Or App at 199, and cases there cited. There is no inherent reason why a particular name cannot have two secondary meanings in a particular area. Moreover, the *evidence* here is that plaintiffs' name rather than Josiah Wedgwood's, is the one that has acquired a secondary meaning in the eastern part of Washington County.

We conclude that plaintiffs are entitled to injunctive relief under ORS 647.107.[5]

Affirmed.[6]

---

[5] In addition to the arguments we have discussed in the text, defendant also contends:

"The court erred in ruling inadmissible defendant's proffered evidence of extensive use of the mark 'Wedgwood' by a large number of third party businesses."

The evidence was offered under the rule, and we have considered it in our *de novo* review.

[6] Defendant has not asked that we modify the decree.