**Marguerite ANDERSON, Plaintiff,**

v.

**Neale Henry REYNOLDS, et al., Defendants.**

**No. CV–R–80–117–ECR.**

United States District Court,
D. Nevada.

May 18, 1984.

---

Philip A. Olsen, c/o Wood, Porter, Simon & Graham, Reno, Nev., for plaintiff.

E. Michael Kruse, Los Angeles, Cal., for defendants.

## MEMORANDUM DECISION AND ORDER

EDWARD C. REED, Jr., District Judge.

*Background*

Plaintiff, Marguerite Anderson, has brought this action seeking to set aside a grant deed, executed by her to Defendant, Neale Henry Reynolds, on August 20, 1979. The grant deed is for a residential property known as 1165 Lakeshore Drive, Incline Village, Nevada, on the shore of Lake Tahoe. This property has a value of between $1,000,000 and $1,600,000. Jurisdiction is based on diversity of citizenship. 28 U.S.C. § 1332(a)(1).[1] A bench trial was held before this Court on January 12 and 13, 1984.

In early 1979, Plaintiff met Defendant, who was an aspiring but unemployed opera singer. Their contacts led to a close relationship. Plaintiff became Defendant's patron or sponsor, providing him with personal support for his living expenses, and with other aid in his quest to become an opera singer. Defendant reciprocated Plaintiff's favors by providing her with companionship and running errands for her. He also became an advisor in the handling of Plaintiff's business affairs, particularly with respect to the sale of some quite valuable property which Plaintiff desired to dispose of. Defendant essentially remained unemployed throughout the period here involved.

Prior to the spring of 1979 Plaintiff had always relied on professionals in the handling of her property and business affairs. She did not have the business acumen to take care of these matters alone, but through considerable experience had learned to seek professional advice and utilize it effectively. Leonard Wohletz, her accountant, testified that she knew how to deal effectively with the professionals, how to ask the right questions and, on that basis, how to reach proper decisions. The estimated value of Plaintiff's estate at that

---

1. Plaintiff is a citizen of Nevada, and the de-    fendants are citizens of different states.

time was between $15,000,000 and $20,000,-000.

Although Plaintiff had a large income and many assets, she had chronic cash flow problems. She consulted with Mr. Wohletz, and was advised that she should give first consideration to the sale of the Lakeshore Drive property, which Plaintiff had only recently inherited. This property produced no income and was worth a great deal of money, and its sale would result in minimal capital gains taxes. Mr. Wohletz also advised Plaintiff to continue her efforts to sell some property located in Ojai, California, which likewise had a considerable value and in effect almost no income.

Plaintiff's professional relationship with Mr. Wohletz began in 1976. She consulted with him in person four to six times a year and much more frequently on the telephone. Plaintiff's attorney was Milton Manoukian of Carson City, with whom she also frequently consulted. It was not uncommon for Plaintiff's professional advisors to consult with one another relative to her affairs. Some time after the commencement of 1979, however, it became apparent to Mr. Wohletz and Mr. Manoukian that their roles as advisors to the Plaintiff were being diminished. Her contacts with them became much less frequent and open. It was clear that Plaintiff was obtaining advice on the management of her business affairs from Defendant. On at least one occasion, Defendant talked to Mr. Wohletz about Plaintiff's financial affairs. They discussed Plaintiff's assets and cash flow. This conversation took place with the authorization of Plaintiff, who advised Mr. Wohletz that Defendant was becoming involved in the management of her affairs.

Defendant had succeeded in gaining Plaintiff's confidence and trust and had convinced her that he had sufficient business expertise to advise and guide her in the conduct of her affairs. He persuaded Plaintiff to believe that he had solutions to her cash flow problems. Plaintiff was obviously prepared to follow his advice.

In this period of time, Plaintiff was also concerned with threats by her daughter to have her placed under a conservatorship, and, she believed, to have her placed in a mental hospital. Plaintiff's daughter was constantly making inquiry as to Plaintiff's property and business affairs.

Defendant led Plaintiff to believe that he was acquainted with many various show business celebrities who might be interested in purchasing the Lakeshore Drive property and the Ojai property as well. In particular, Defendant told Plaintiff that he was personally acquainted with Karl Malden and Paul Newman. On one occasion he advised her that Karl Malden was very interested in both properties and that she should call his business office in Los Angeles. When Plaintiff telephoned Mr. Malden's office she was advised that the personnel there had never heard of Plaintiff or her property. In August of 1979, Defendant told Plaintiff that Paul Newman, who was then in Hawaii, was interested in the properties. He asked her to arrange for him to go to Hawaii to see if he could sell the property to Mr. Newman. Plaintiff purchased the necessary airplane tickets and made arrangements for Defendant to go to Hawaii for this purpose.

In the course of advising Plaintiff as to the disposition of these properties Defendant sought to have Plaintiff deed the Lakeshore Drive property to him. He advised her that it was necessary to do this so that he could show the prospective buyers that he held title to the property and was authorized to deal with it. He claimed that some of the individuals who were interested in buying the property desired to deal with the principals to avoid the payment of real estate broker's commissions.[2] About the time of the proposed Hawaii trip Defendant was becoming more and more insistent that the Tahoe property be deeded to him so that he could more readily deal with it in Plaintiff's behalf.

Plaintiff verified that Paul Newman was in fact in Hawaii at that time. She then decided to follow the Defendant's advice

---

**2.** Defendant was not a licensed real estate bro- ker or salesman.

and deed the property to him. She did not seek the advice of the professionals who had been her advisors for a long period of time but rather decided to deed the property solely on Defendant's advice. Plaintiff and Defendant then went to some sort of an office (possibly that of a real estate broker or title company) in Gardnerville, Nevada, where the grant deed was prepared. Plaintiff then executed the grant deed and delivered it to Defendant. It is clear this Deed was executed for the purpose of enabling Defendant to act as Plaintiff's agent in the possible sale of the property and was never intended as a gift by Plaintiff to Defendant.

Defendant's effort to sell the Lakeshore Drive property to Paul Newman was apparently unsuccessful. However, Defendant continued to assure Plaintiff that he was seeking a buyer for the property and that there were good prospects. Plaintiff received a number of inquiries and calls respecting the property. The validity of these calls as an indication of genuine interest in purchase of the property became a matter of doubt in Plaintiff's mind, and she asked Defendant to return the grant deed. Defendant responded with excuses, claiming that he could not locate the deed, or that he would return it in person because it was unsafe to use the mails.

In the meantime, as summer passed into fall the close friendship between Plaintiff and Defendant deteriorated and was finally terminated by November of 1979. Plaintiff continued to demand return of the deed and it was at that time that Defendant took the deed to his attorney, Michael Kruse. Mr. Kruse advised Defendant that the grant deed should be immediately recorded and made arrangements to do so on November 27, 1979, advancing the necessary money to pay the Nevada real estate transfer tax.

By this time Plaintiff was highly concerned as to the fate of the grant deed. She was then apparently in the process of returning to the fold of her professional advisors, including Mr. Wohletz, Mr. Manoukian, and in addition, a firm known as the Nichols Law Corporation of San Francisco. It was on the advice of either Mr. Manoukian or the Nichols Law Corporation that Plaintiff then executed a quitclaim deed for the property to Silver State Land and Cattle Corporation of which she was the sole stockholder. The quitclaim deed was recorded on December 10, 1979, but Mr. Kruse had already beaten plaintiff to the courthouse, having recorded his deed some 13 days previously.

On or about January 15, 1980, Mr. Kruse and Defendant agreed that Defendant would execute a deed of trust of the property in favor of Mr. Kruse. A printed California form of deed of trust was used. The underlying obligation, however, was set forth in a curious handwritten document (in the hand of Defendant) which stated that Mr. Kruse had agreed to represent Defendant in the sale of the Lakeshore Drive property, including the responsibility to pay the costs of sale, real estate broker's commissions, finder's fees, legal services and closing costs. The document also recited that in return for these services, Mr. Kruse was to receive 20% of the proceeds of the sale. In view of the valuation placed on the property by Mr. Kruse in his testimony it is unclear how they arrived at the supposed $375,000 figure which the deed of trust was supposed to secure. Whether this deed of trust was given for the purpose of encumbering the property to defeat Mrs. Anderson's efforts to regain it or to insure Mr. Kruse payment of his fees and payment of the alleged broker's commissions is not entirely clear, but the former seems more likely than the latter.[3]

In late January of 1980 Defendant contacted one John Fuller with the intent of executing and recording of an additional deed of trust to further encumber the property. Defendant again prepared, in his own handwriting, a statement which was

---

**3.** It appears that subsequent to the filing of this action, plaintiff has been able to acquire Mr. Kruse's deed of trust for a figure of approximately $7,500 and the claim originally asserted against Mr. Kruse as a co-defendant has been settled on that basis.

supposed to be the obligation to be secured by the Fuller deed of trust. That deed of trust recited that Defendant had received $200,000 in exchange for the second deed of trust to Fuller, which sum was to be deposited in Defendant's numbered Swiss bank account. The monies received were purportedly to be used to fund Defendant's international business. There is no credible evidence in this record to support the proposition that there was any value given for the Fuller deed of trust.[4]

Mr. Kruse did not cause either his deed of trust or the Fuller deed of trust to be recorded until March 31, 1980. After that date the Defendant signed other deeds of trust in favor of other individuals in an effort to further cloud the title to the subject property and to thwart Mrs. Anderson's efforts to reclaim title.

### Analysis

■ The elements of intentional fraudulent misrepresentation are:

(1) A false representation made by the defendant;

(2) Knowledge or belief on the part of the defendant that the representation is false;

(3) An intention to induce the plaintiff to act or to refrain from acting in reliance on the misrepresentation;

(4) Justifiable reliance upon the representation on the part of the plaintiff in taking action or refraining from it; and

(5) Damage to the plaintiff, resulting from such reliance.

*Lubbe v. Barba,* 91 Nev. 596, 540 P.2d 115, 117 (1975).[5]

■ A promise made without the intent to perform it is fraudulent. *See Sharp v. Idaho Investment Corp.,* 95 Idaho 113, 504 P.2d 386, 395 (1972); *Steiger v. Commerce Acceptance of Oklahoma City,*

*Inc.,* 455 P.2d 81, 86 (Okl.1969); *Elizaga v. Kaiser Foundation Hospitals, Inc.,* 259 Or. 542, 487 P.2d 870, 874 (1971); *Employer's Liability Assurance Corp. v. Lunt,* 82 Ariz. 320, 313 P.2d 393, 396 (1957); 37 C.J.S. *Fraud* § 12 at 237–39 (1943). If the execution of a contract is induced by fraud, the contract is voidable. *Havas v. Alger,* 85 Nev. 627, 461 P.2d 857, 859 (1969). A claim of fraud must be supported by clear and convincing evidence. *Lubbe, supra,* 540 P.2d at 117.

■ In the present case, it is clear that defendant represented to the plaintiff that he would deal with the Lakeshore Drive property on her behalf and as her agent in an effort to sell it for her. It is also clear that he knew that these representations were false; that he intended that the plaintiff would rely on his misrepresentations and convey the Lakeshore Drive property to him; that defendant intended to keep the property as his own at the time he made these misrepresentations; and that plaintiff relied on defendant's misrepresentations in executing and delivering the grant deed to the Lakeshore Drive property.

The facts of this case, including Plaintiff's increasing use of Plaintiff's advice on her business affairs in 1979, together with the corresponding decrease in the use that she made of her professional advisors during that period, clearly indicates that Defendant was acting as a fiduciary in these matters. Under such circumstances, Plaintiff was entitled to regard her business relationship with the defendant as one of trust and confidence, and her reliance on the representations made by Defendant was justifiable. *Sanguinetti v. Strecker,* 94 Nev. 200, 577 P.2d 404, 409 (1978).[6] Plaintiff has been damaged as a result of being deprived of her property; this loss

---

**4.** Plaintiff's action against Fuller, as a defendant herein, has likewise been settled by Fuller assigning his deed of trust to Plaintiff for some $7,500.

**5.** *See infra* note 6.

**6.** We note that the Nevada Supreme Court has held that justifiable reliance need not be estab-

lished "when a party asserts misrepresentation as grounds for rescission of a contract." *Pacific Maxon, Inc. v. Wilson,* 96 Nev. 867, 619 P.2d 816, 818 (1980). Nevertheless, we find that justifiable reliance has in fact been shown in this case.

was a proximate result of Defendant's misrepresentations. We thus conclude that Plaintiff has established by clear and convincing evidence that Defendant has fraudulently obtained the Lakeshore Drive property from her. Therefore, the grant deed by which he obtained the property should be set aside. *See Pacific Maxon, Inc. v. Wilson*, 96 Nev. 867, 619 P.2d 816 (1980).

The foregoing shall constitute this Court's Findings of Fact and Conclusions of Law.

IT IS, THEREFORE, HEREBY ORDERED that a Judgment and Decree of this Court shall be entered that:

1. The Grant Deed of 1165 Lakeshore Drive, Incline Village, Nevada, executed by Plaintiff to Defendant on August 20, 1979, and recorded as Document No. 643534 in the Official Records of Washoe County, Nevada on November 27, 1979, is null and void and of no force or effect whatever.

2. Defendant Neale Henry Reynolds has no right, title or interest in the said property.

Attached hereto as Exhibit "A" and incorporated herein by reference is a legal description of the said property which is the subject of this Order.

### EXHIBIT "A"

All that certain lot, piece or parcel of land situate in the County of Washoe, State of Nevada, being more particularly described as follows:

Commencing at the United States Government Meander corner of Lake Tahoe, common to Sections 22 and 23, Township 16 North, Range 18 East, M.D.B. & M., from which the section corner common to Sections 14, 15, 22 and 23, Township 16 North, Range 18 East, M.D.B. & M., bears North 3372.60 feet; thence along the meander line of Lake Tahoe the four following courses and distances: South 49° East 924 feet; South 35° East 561.00 feet; South 71° East 316.8 feet; South 46° East 428.25 feet to the point of beginning, said point being the Southeast corner of the parcel conveyed to William Washburn by deed recorded in Book 119, Page 187, File No. 84028, Deed Records; thence North 19° 43' East along the Easterly line of said Washburn parcel 303.79 feet, more or less, to the Westerly line of State Highway Route 28; thence South 16° 12' East along said Westerly highway right of way line 263.0 feet to the Northwest corner of that parcel of land described in the deed from Cummings to Tush, recorded August 24, 1961, under Filing No. 342758, Deed Records; thence South 19° 43' West to Lake Tahoe; thence Northwesterly along the lake shore to a line drawn South 19° 43' West from the point of beginning; thence North 19° 43' East to the point of beginning.