164 F.3d 1218
 137 Lab.Cas. P 58,520, 14 IER Cases 1226,
99 Cal. Daily Op. Serv. 336,
99 Daily Journal D.A.R. 396
 William MEADE; Catherine A. Meade; Leland S. Stewart;
Frankie Lee Stewart; Doug Vierkant; Linda K.
Vierkant; David Girard; and Elizabeth
D. Girard, Plaintiffs-Appellants,
v.
CEDARAPIDS, INC., an Iowa corporation, dba El-jay Division
of Cedarapids, Inc.; Raytheon Corporation, a Delaware
corporation; and Raytheon engineers AND Constructors
International, Inc., a Delaware corporation, Defendants-Appellees.
 No. 97-35836.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 15, 1998.
Decided Jan. 12, 1999.
 
 1
 Richard C. Busse, Scott N. Hunt, Busse & Hunt, Portland, Oregon, for the plaintiffs-appellants.
 
 
 2
 Jeffrey M. Batchelor, George L. Kirklin, Robert L. Carey, Lane Powell Spears Lubersky LLP, Portland, Oregon, for the defendants-appellees.
 
 
 3
 Appeal from the United States District Court for the District of Oregon; Michael R. Hogan, District Judge, Presiding. D.C. No. CV-95-6307-CO.
 
 
 4
 Before: WALLACE and KOZINSKI, Circuit Judges, and EZRA,* District Judge.
 
 
 5
 Opinion by Judge EZRA; Concurrence by Judge KOZINSKI; Partial Concurrence and Partial Dissent by Judge WALLACE.
 
 EZRA, District Judge:
 Factual Background
 
 6
 Plaintiffs William Meade, Leland S. Stewart, Doug Vierkant, and David Girard ("Plaintiffs") and their spouses, Catherine A. Meade, Frankie Lee Stewart, Linda K. Vierkant, and Elizabeth D. Girard ("Spouses") appeal the district court's summary judgment in favor of Cedarapids and related corporations ("Defendants") in Plaintiffs' diversity action. Plaintiffs allege fraudulent misrepresentation and intentional infliction of emotional distress, arising from the closure of the El-Jay Division of Cedarapids ("El-Jay") in Eugene, Oregon.
 
 
 7
 The main factual dispute centers on when the decision to close El-Jay was made. Plaintiffs assert that it was made in July of 1994, long before any of them even applied for a job. Defendants contend that a plan (rather than a decision) was made at that time, and that the plan was contingent upon a number of factors, including 1) approval of a capital expenditure of approximately $5,000,000 in order to expand the Cedar Rapids, Iowa facility, 2) approval by the Iowa Department of Economic Development of a $1,000,000 tax incentive package, and 3) approval by the labor union of changes in the work rules in order to integrate the consolidated work force in Iowa. Defendants further argue that this last contingency was not resolved until May 1, 1995 and that, therefore, the decision to close El-Jay was not made until that time. Both Plaintiffs and Defendants have produced evidence supporting the date on which each believes the decision to close El-Jay was made.
 
 
 8
 Each Plaintiff applied for and was offered a job at El-Jay between August 1994 and April 1995. Before accepting the positions, Plaintiffs each signed an at-will employment agreement stating that their employment was subject to termination by either party at any time. To accept the positions at El-Jay, each Plaintiff either quit the job he was then doing or passed up other employment opportunities. Each Plaintiff and his spouse moved to Eugene, Oregon, where El-Jay was located.
 
 
 9
 Plaintiffs assert that Defendants made intentional or reckless misrepresentations during the course of the hiring process. For instance, Plaintiffs allege that in response to specific questions about El-Jay's future growth, they were told how desirable it was to live in Eugene; that there would be growth in the parts business; that El-Jay would be growing 20% in the next year; that El-Jay was running out of office space; that sales were up and were expected to increase; that production rates were expanding; that El-Jay was a stable company with few downsizings and layoffs; that it would be hiring more staff and creating new positions; that the company was "ramping up"; that the future looked great for the company; and that the company's growth was a "long term situation."
 
 
 10
 The personnel who made these statements were unaware of the closure plan. Some of these persons stated that they would not have made these statements had they known of the closure decision. Plaintiffs contend they never would have interviewed with El-Jay had they known of the closure plans. Plaintiffs gave notice to their employers and prospective employers in reliance on Defendants' representations and omissions. Plaintiffs also assert Defendants knew that Plaintiffs would consult with their wives regarding the representations before deciding to relocate.
 
 
 11
 On July 24, 1997, the district court granted summary judgment to Defendants, holding that Defendants had no duty to disclose their closure plan and that Plaintiffs could not, as a matter of law, reasonably have relied on the representations made to them. Moreover, the district court concluded that Defendants' conduct in not disclosing the plans to close El-Jay to Plaintiffs during prehire interviews cannot, as a matter of law, be outrageous enough to exceed the bounds of social tolerance. The district court had jurisdiction pursuant to 28 U.S.C. § 1332. We have jurisdiction over this timely filed appeal pursuant to 28 U.S.C. § 1291. We affirm in part, and reverse in part.
 
 Standard of Review
 
 12
 Summary judgment is reviewed de novo. Covey v. Hollydale Mobilehome Estates, 116 F.3d 830, 834 (9th Cir.1997). Our review is governed by the same standard used by the trial court under Fed. R. Civ. Pro. 56(c). Ghotra v. Bandila Shipping, Inc., 113 F.3d 1050, 1054 (9th Cir.1997). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Covey, 116 F.3d at 834. We must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial. Id. Summary judgment is not proper if material factual issues exist for trial. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir.1995).
 
 Discussion
 
 13
 I. Intentional or Reckless Misrepresentation
 
 
 14
 To support their claims of misrepresentation under Oregon law, Plaintiffs must establish 1) that Defendants made a false representation of material fact; 2) with the knowledge or belief that it was false, or with an insufficient basis for asserting that it was true; 3) with the intent that Plaintiffs rely on it; 4) that Plaintiffs justifiably relied; and 5) that Plaintiffs suffered consequent damages. Maitland v. Mitchell (In re Harris Pine Mills), 44 F.3d 1431, 1439 (9th Cir.1995) (citing Riley Hill Gen'l Contractor v. Tandy Corp., 303 Or. 390, 737 P.2d 595, 604 (Or.1987)).
 
 
 15
 Reckless indifference to the truth or falsity of a statement can satisfy the state of mind requirement for a misrepresentation action. Elizaga v. Kaiser Foundation Hospitals, 259 Or. 542, 487 P.2d 870, 873 (Or.1971). A party need not make an affirmative statement to be liable for fraud. Caldwell v. Pop's Homes, Inc., 54 Or.App. 104, 634 P.2d 471, 477 (1981). The mere nondisclosure of material facts can be a form of misrepresentation where the defendant has made representations which would be misleading without full disclosure. Elizaga, 487 P.2d at 873. The extent to which a representation is misleading and, therefore, imposes a duty of disclosure, is a question of fact. Gregory v. Novak, 121 Or.App. 651, 855 P.2d 1142, 1144 (1993).
 
 A. False Representations
 
 16
 Defendants assert that no rational trier of fact could find that Defendants made false representations. The district court agreed. However, viewing the evidence in the light most favorable to Plaintiffs, a reasonable trier of fact could find that Defendants' agents made false representations.
 
 
 17
 In order to show that Defendants made misrepresentations, Plaintiffs need not establish a duty to disclose, but instead must prove the truth of their claim that Defendants had already reached a decision on the closure of El-Jay. Plaintiffs have adduced sufficient evidence to be allowed to prove this before a trier of fact. If the trier of fact finds that Defendants' decision was sufficiently certain, they could then conclude that Defendants' representations of future growth, "ramping up," etc. were false at the time they were made.
 
 
 18
 There are two bases on which Defendants could be found to have made false representations. First, the mere nondisclosure of material facts can be a form of misrepresentation where the defendant has concealed a known fact that is material to the transaction, see Millikin v. Green, 283 Or. 283, 583 P.2d 548, 550 (1978), or has made representations that would be misleading without full disclosure, see Felonenko v. Siomka, 55 Or.App. 331, 637 P.2d 1338, 1340 (1981). Defendants argue that nondisclosure is actionable only where a defendant has made representations that would be misleading without full disclosure and there is a duty to disclose. The district court apparently agreed and held that since there was no duty to disclose, there was no actionable fraud. However, this is not entirely correct. "[O]ne who makes a representation that is misleading because it is in the nature of a 'half-truth' assumes the obligation to make a full and fair disclosure of the whole truth." Gregory, 855 P.2d at 1144.
 
 
 19
 Under Oregon law, there is a duty to disclose likely material contingencies. In Elizaga v. Kaiser Found. Hosp., 259 Or. 542, 487 P.2d 870 (1971), an employer made representations that could imply that the job offered to the plaintiff would continue past a certain date. The employer knew, however, that the position would "probably" be terminated before that date. Since "nondisclosure of material facts can be a form of misrepresentation where the defendant has made representations which would be misleading without full disclosure," the Oregon Supreme Court held that "[i]n order to avoid misleading plaintiff, defendant was under a duty to disclose that the Board of Examiners might well terminate the program." Id. at 873; see also Caldwell, 634 P.2d at 477 (holding that failure to disclose possible sale of mobilehome park was actionable because "the likelihood that the mobile home would remain in the park was crucial to plaintiff's decision to purchase").
 
 
 20
 Second, Plaintiffs contend that no duty to disclose is required when fraud is based upon active concealment, as opposed to nondisclosure. Plaintiffs allege Defendants actively concealed the closure by intentionally withholding material information from El-Jay management. The fact that El-Jay management did not know of the closure is irrelevant because "[a] principal who deliberately withholds material facts from his agent in order that the agent may innocently misrepresent the facts is guilty of fraud if the agent does in fact make such a misrepresentation and it is relied on by the third party." Bodenhamer v. Patterson, 278 Or. 367, 563 P.2d 1212, 1215-16 (Or.1977); Restatement (Second) Agency 555 § 256.
 
 
 21
 The district court erred in holding, as a matter of law, that no reasonable trier of fact could conclude that Defendants made false representations. Plaintiffs have put forth sufficient evidence to allow a jury reasonably to decide either way.
 
 
 22
 Defendants argue that they should not be forced to disclose sensitive business information. Defendants would not have been placed in this position, however, but for the false impression created by statements suggesting future growth and the "ramping up" of production. But for Defendants' affirmative misrepresentations, there would be no duty to disclose.
 
 B. Justified Reliance
 
 23
 The district court held that Plaintiffs were not justified in relying on representations and omissions made during their pre-employment negotiations, as a matter of law, because Plaintiffs each signed an at-will employment agreement. That Plaintiffs' employment with Defendants was at-will does not defeat their justified reliance on Defendants' representations about El-Jay. Even in the presence of language stating "no promises about employment have been made," an action for fraud in the inducement of a contract is possible. See Wilkinson v. Carpenter, 276 Or. 311, 554 P.2d 512, 515 (1976). The representation Plaintiffs relied upon in this case is that El-Jay was growing and expanding. Plaintiffs were not relying on representations as to the duration of their employment. Plaintiffs accepted at-will employment, but they accepted at-will employment with a company that represented its Eugene facility as growing while failing to disclose and/or concealing that it was closing.
 
 
 24
 Furthermore, Plaintiffs contend that their injuries were suffered as a result of the fraudulent inducement to enter employment, not the premature termination of that employment. The district court apparently treated the claims as breach of contract claims rather than claims of fraudulent inducement to form a contract.
 
 
 25
 Finally, Plaintiffs maintain that allowing at-will employment to defeat Plaintiffs' reliance would effectively allow employers to make any representations to prospective employees and then not fulfill those representations once employment began. We agree. Although Plaintiffs had no reasonable expectations for employment of any particular duration, they reasonably relied on statements as to the company's future growth, particularly when given in response to Plaintiffs' concerns. If Plaintiffs can prove Defendants' representations were knowingly or recklessly false, then a reasonable trier of fact could find the requisite elements of the tort of fraudulent misrepresentation.
 
 
 26
 Therefore, because genuine issues of material fact exist as to whether Defendants made false representations and whether Plaintiffs justifiably relied on those representations, we reverse the district court's grant of summary judgment on this claim.
 
 C. Spouses' Misrepresentation Claims
 
 27
 In order for Plaintiffs' spouses to establish a claim for misrepresentation, Plaintiffs will have to prove that Defendants "made a representation to [Plaintiffs] ... under circumstances that entitled [the spouses] to believe that [Cedarapids] had authorized [Plaintiffs] to communicate the representation to [the spouses]." Johnsen v. Mel-Ken Motors, Inc., 134 Or.App. 81, 894 P.2d 540, 545 (1995). Because spouses usually make decisions as a family unit rather than as separate individuals, it is likely that the process of deciding whether to relocate for a new job involves convincing the spouse that the positive qualities of the new job outweigh the difficulties caused to the family. Although Defendants argue that Plaintiffs cannot prove that any representations were made under such circumstances, we do not, as a matter of law, hold that Plaintiffs cannot so prove. Therefore, we reverse the district court's grant of summary judgment on this claim.
 
 
 28
 II. Intentional Infliction of Emotional Distress
 
 
 29
 Under Oregon law, the elements of the tort of intentional infliction of emotional distress are 1) the defendant intended to inflict severe emotional distress on the plaintiff; 2) defendant's acts were the cause of plaintiff's severe emotional distress; and 3) defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct. McGanty v. Staudenraus, 321 Or. 532, 901 P.2d 841, 849 (1995).
 
 
 30
 Plaintiffs fail to satisfy these requirements. First, intent means that the actor either desires to inflict severe emotional distress or knows that such distress is certain or substantially certain to result from his or her conduct. See id. at 853. Although Plaintiffs adduced evidence to show that Defendants had considered the effects the closure would have on Plaintiffs, there is no evidence indicating that severe emotional distress on the part of the Plaintiffs was a substantial certainty or that Defendants intended to cause such distress.
 
 
 31
 Second, although the Defendants' conduct, as described by Plaintiffs, is objectionable, it can hardly be described as an "extraordinary transgression of the bounds of socially tolerable conduct." Plaintiffs correctly point out that this determination is made in consideration of the parties' relationship. Even if the employer/employee context imposes a greater obligation to refrain from inflicting emotional distress, there is no evidence that Plaintiffs suffered what case law generally recognizes as severe emotional distress, for example, fright and abuse. Plaintiffs were undoubtedly unhappy, but mere malcontent does not amount to severe emotional distress.
 
 
 32
 Because Plaintiffs have not proffered evidence raising a genuine issue that Defendants intended or knew with substantial certainty that their conduct would cause severe emotional distress and because Defendants' conduct does not rise to the level of "an extraordinary transgression of the bounds of socially tolerable conduct," we affirm the district court's summary judgment in favor of Defendants on the intentional infliction of emotional distress claim.
 
 
 33
 Although the dissent makes much of the fact that our opinion is not binding precedent, there are few published decisions addressing these issues. In light of the paucity of such case law, we feel that future litigants will benefit from the court's published opinion.
 
 
 34
 AFFIRMED IN PART AND REVERSED IN PART.
 
 KOZINSKI, Circuit Judge, concurring:
 
 35
 I am pleased to join Judge Ezra's opinion because it states the law of Oregon as I understand it. I write separately only to note that the majority and dissent part ways on a fundamental issue, namely our understanding of how spouses relate to one another in today's world. There may have been a time in our history when important family decisions were made by the husband, with little or no input from the wife. If things were ever that way, they no longer are. A marriage is a partnership, and major decisions such as whether the family will pull up roots and move to a different city are normally made by the partners jointly. Only a very foolish employer will try to persuade a prospective employee to relocate without addressing the concerns of the spouse. Cedarapids's own officers testified to this understanding. If the question were presented to the Oregon Supreme Court, I believe it would hold that an employer who makes false representations to a prospective employee who is married must expect that the employee will share the information with the spouse, who may rely on it in consenting to the move. Neither we nor the courts of Oregon need be reminded that our opinion is not binding on them; we learned this in law school. However, I hope that the clash of our contrasting viewpoints may help sharpen the issue when the state courts do take it up.
 
 
 36
 WALLACE, Circuit Judge, concurring and dissenting:
 
 
 37
 Because this is entirely an issue of state law, the majority's opinion is not controlling and Oregon courts need give it no deference at all. See, e.g., Wedgwood Homes, Inc. v. Lund, 58 Or.App. 240, 648 P.2d 393, 396 (1982) (rejecting federal court's interpretation of state statute), aff'd, 294 Or. 493, 659 P.2d 377 (1983). Therefore, I would not publish this nonprecedential opinion.
 
 
 38
 I concur with the majority that summary judgment was proper as to plaintiffs' emotional distress claims and that there are genuine issues of material fact with regard to the husband-plaintiffs' misrepresentation claims. I do not agree, however, that summary judgment as to the spouse plaintiffs' (Spouses) misrepresentation claims was improper.
 
 
 39
 Oregon law demands that the Spouses produce evidence that Cedarapids made representations to their respective husbands "with the intention that [the representations] be communicated to and acted upon by [the Spouses], or under circumstances that entitled [the Spouses] to believe that [Cedarapids] had authorized [the husbands] to communicate the representation to [the Spouses]." Johnsen v. Mel-Ken Motors, Inc., 134 Or.App. 81, 894 P.2d 540, 545 (1995) (Johnsen ). For example, in Johnsen, an injured employee told his vocational rehabilitation expert that he would return to his previous job and forego vocational training if his job were "long-term." The vocational expert, in turn, expressed this concern to the employer, who stated that the employee's position was indeed "long-term." The court held that "[i]t could be reasonably inferred from all the evidence that [the employer] made the representation to [the vocational expert] about the permanence of employment with the intention that it be conveyed to plaintiff in order to induce him not to pursue vocational retraining." Id. at 546. There is no such evidence in this case.
 
 
 40
 The only evidence proffered by the Spouses as to Cedarapids' intent is that three of Cedarapids' recruiters and one executive expected that the recruits would discuss matters with their wives. Since the recruiters were unaware of the closure plans, the relevance of their intent is questionable. That leaves the Spouses' claims resting on the testimony of one executive who did not invite the recruits to discuss matters with their spouses but "would assume that they do." There is nothing in the record to indicate that any representations specifically targeted the Spouses. None of the recruiters said anything like, "You can tell your wife that there is a lot of growth here at El-Jay." Nor did any of the plaintiffs make inquiries such as, "My wife is worried about job security, what can I tell her about El-Jay."
 
 
 41
 Although it may be subtle, there is a difference between assuming that a representation will be communicated to a third party and actually intending the representation be communicated and acted upon. Evidence of the former, which is all we have in this case, is not enough to survive summary judgment.
 
 
 42
 The majority does not comment on this theory of liability, apparently conceding that this evidence is not enough to avoid summary judgment as to Cedarapids' intent. Rather, the majority focuses on the second part of the Johnsen test: the Spouses may prove that Cedarapids made the representations "under circumstances that entitled [the Spouses] to believe that [Cedarapids] had authorized [the husbands] to communicate the representation to [the Spouses]." (Emphasis added.) Thus, the Spouses may survive summary judgment if they produced evidence creating a genuine issue of material fact as to whether Cedarapids' actions gave the husbands apparent authority. See American National Bank of Denver v. Tonkin, 286 Or. 73, 592 P.2d 1008, 1013 (1979) (American National Bank ) (citing but not adopting "more liberal formulation of the rule" making defendant liable where third party had "Actual or Apparent Authority" to communicate the representation) (cited by the court in Johnsen as the support for its rule, 894 P.2d at 545).
 
 
 43
 To confer apparent authority on an agent under Oregon law, there must be " 'some conduct of the principal which, when reasonably interpreted, causes a third party to believe that the principal consents to have the apparent agent act for him on that matter.' " Mattson v. Commercial Credit Business Loans, Inc., 301 Or. 407, 723 P.2d 996, 1004 (1986), quoting Jones v. Nunley, 274 Or. 591, 547 P.2d 616, 618 (1976). Foundational to an apparent authority claim is the principal-agent relationship. As job applicants, the husbands were by definition not agents of Cedarapids. See Larrison v. Moving Floors, Inc., 127 Or.App. 720, 873 P.2d 1092, 1094 (1994) ("Agency is the fiduciary relationship that results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control and consent by the other so to act."). Nor could Cedarapids have conferred upon them apparent agency as the Spouses knew well that their husbands were only applicants. See Miller v. McDonald's Corp., 150 Or.App. 274, 945 P.2d 1107, 1111-12 (1997) (stating that apparent agency is created where the defendant "represents that another is his servant or other agent").
 
 
 44
 Yet the majority holds that the Spouses may avoid summary judgment because "[a]lthough Defendants argue that Plaintiffs cannot prove that any representations were made under such circumstances, we do not, as a matter of law, hold that Plaintiffs cannot so prove." This, of course, is not the correct standard for summary judgment; plaintiffs must have "demonstrate[d] that the evidence is such that a reasonable jury could return a verdict in [their] favor." Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir.1998). This requires evidence, not speculation. But more importantly, the majority's holding indicates that representations made to one spouse may virtually per se form the basis for a misrepresentation claim by the other spouse "[b]ecause spouses usually make decisions as a family unit rather than as separate individuals."
 
 
 45
 This turns the rule on its head. Instead of focusing on the relationship between the third party communicator and the defendant and actions of the defendant that may create apparent authority, the majority directs the fact finder to examine the relationship between the third party and the plaintiff as well as the type of decision that must be made. Under the majority's rule, by merely seeking a decision from the husbands, Cedarapids may have somehow given the husbands apparent authority. Not only is this contrary to Oregon law, but it creates an unworkable rule.
 
 
 46
 What types of decisions entitle a spouse to rely on representations made to the other spouse? Important decisions? Significant decisions? All decisions? Suppose a broker makes misrepresentations to an obviously married woman about the value of some swampland. The woman says, "Well, let me go home and think about it." The broker expects that the woman will discuss the matter with her husband. Having spoken to her husband (unbeknownst to the broker), she returns the next day and invests half the family fortune. Would the husband have a claim because "spouses usually make decisions as a family unit"? Would the husband have a claim if the wife were only swindled for a hundred dollars? Fifty? Ten? Does it matter how wealthy the couple was? Does it matter whether the broker knew how wealthy the couple was?
 
 
 47
 Rather than basing claims on sociological conceptions of the "family unit" not adopted by Oregon courts, Oregon law requires evidence demonstrating that the misrepresentation is aimed at (i.e., intended for) the third-party plaintiff or that the defendant's acts were such to give its agent apparent authority. See, e.g., American National Bank, 592 P.2d at 1013 (upholding jury verdict that a bank misrepresented loan terms to a guarantor via the borrower when the bank conditioned loan on the guarantor's assent and the bank expected representations to be communicated to guarantor). The evidence is insufficient to get by summary judgment on an apparent authority theory. The Spouses must therefore produce evidence that Cedarapids intended the husbands to convey the communications and that Cedarapids intended the Spouses to rely upon those representations. There is no such evidence in this case.
 
 
 48
 Fortunately, as I said before, the majority view is not precedential. All seem to agree. Even if a "clash of our contrasting viewpoints" would help, our prose would not be lost by non-publication.
 
 
 
 *
 Honorable David Alan Ezra, Chief United States District Judge for the District of Hawaii, sitting by designation