Argued and submitted July 6, 1990, affirmed October 30, 1991

Monte SIEGNER
Pat Siegner, Pat Fewel
and Peggy Fewel,
*Respondents,*

*v.*

INTERSTATE PRODUCTION CREDIT
ASSOCIATION OF SPOKANE,
*Appellant.*

(87-11-9314-L; CA A60506)

820 P2d 20

James N. Westwood, Portland, argued the cause for appellant. With him on the briefs were R. Alan Wight, Gregory A. Chaimov and Miller, Nash, Wiener, Hager & Carlsen, Portland.

Douglas E. Hojem, Pendleton, argued the cause and filed the brief for respondents.

Before Buttler, Presiding Judge, and Rossman and De Muniz, Judges.

BUTTLER, P. J.

**BUTTLER, P. J.**

Defendant Interstate Production Credit Association of Spokane, a federally chartered cooperative credit association, appeals from a judgment entered after a jury verdict for plaintiffs on their claims for breach of an agreement, partly oral and partly written, to lend them money on annually renewable loans for 15 years and for breach of the obligation of good faith in the performance of that agreement.[1]

We recite the facts most favorably to plaintiffs. *Foelker v. Kwake,* 279 Or 379, 381, 568 P2d 1369 (1977). Plaintiffs are partners who, before the events involved in this action, owned a cattle ranch in southern Harney County, known as Wrench Ranch. During 1978 or 1979, Ron Jinings, a loan officer with defendant, began visiting plaintiffs, seeking to induce them to do business with defendant. Plaintiffs initially told Jinings that they were happy with their present lender and had no reason to switch. Jinings told them that defendant was the premier agricultural lender in the region, that its rates were competitive, that defendant understood the ups and downs of the cattle market and that it stayed with its borrowers through such cycles over the "long haul." Jinings continued to visit plaintiffs every few months.

In late summer or early fall of 1980, continuing his effort to obtain plaintiffs' business, Jinings stopped by to tell plaintiffs that the nearby Coleman Ranch was for sale and that it would make a good addition to Wrench Ranch. Plaintiff Monte Siegner had not been aware that the Coleman Ranch was for sale and told Jinings that, in any event, plaintiffs were in no position to purchase it. Jinings assured him that defendant would finance the down payment, the purchase of livestock and equipment and its operation. He added that defendant would advance funds for annual payments on both ranches.

---

[1] The amended complaint also asserted claims for fraud and breach of fiduciary duty and sought a permanent injunction requiring defendant to continue funding the operation of Wrench Ranch according to the terms of the alleged oral agreement. The court struck the fraud claim, because it was not brought within the two year Statute of Limitations. It also struck the breach of fiduciary duty claim and ruled that it had no authority to grant the requested injunction. Those rulings are not involved in the appeal.

Relying on that conversation with Jinings, plaintiffs began to negotiate for the possible purchase of the Coleman Ranch. Before committing themselves, however, they told Jinings that, in order to purchase it, they would need to borrow approximately $950,000 initially. Jinings said that defendant would loan that amount. He also assured Siegner that he was aware that it would take at least 15 years for plaintiffs to make an appreciable reduction in the contemplated debt, including the debt that they would incur if they purchased the Coleman Ranch.

Jinings told plaintiffs that defendant would not interfere with plaintiffs' management. Mr. Siegner advised Jinings that the initial loan would not cover the cost of replacing culled cows in the fall of the first year. Jinings agreed that, as a part of proper management, it would be necessary to replace culled cows. He also agreed that, in order to be profitable, the ranch would have to be stocked to capacity. Jinings and Siegner also discussed how the ranch might be more profitable if, instead of selling the calves in the fall after their birth, plaintiffs held them for an additional season and sold them as yearlings the following summer or fall. It can reasonably be inferred from the testimony that Siegner requested financing for that type of operation and that Jinings said that it would be available.

Jinings testified that he knew that the cattle industry is cyclical and that a cattle rancher must have long term financing. He admitted that defendant advertised that it would provide financing for the "long haul." He also admitted that he never expected plaintiffs to pay the loan back in the first year, that he told plaintiffs that the business would have a certain length of time to "prove" itself and that he was aware that it could take 10 to 20 years to pay off the capital investment portion of the loan. He testified that it was contemplated by the parties that both ranches would be run as a unit, that each would be kept fully stocked and that future advances were contemplated to provide for additional funds for the culling and replacement of the cattle in order to keep the herd healthy and at full capacity.

In reliance on Jinings' assurances, plaintiffs executed an agreement to purchase the Coleman Ranch for $825,000, with a $150,000 down payment and the balance to

be paid over 15 years in annual payments of $75,000, including interest. With Jinings' knowledge, plaintiffs signed a contract to purchase the Coleman Ranch on March 12, 1981.[2]

In pursuing a long term loan with plaintiffs for the purchase of real estate, defendant was attempting to fill a void in the agricultural financial market. There is evidence, however, that, in seeking plaintiffs' business, defendant was deviating from its general practice of not lending money for the purchase of real estate. Also, defendant had had a policy of not providing long term lending and had required that loans be paid down to a zero balance at least once during each year of the loan.

After signing the contract with Coleman, plaintiffs met with Jinings to execute the loan documents relating to their loan from defendant. They were not represented by an attorney. Plaintiffs had not seen the documents before that meeting. They were surprised by the provision that permitted defendant to require them to inject cash if the loan margin fell below acceptable levels. Jinings told plaintiffs that that language was a mere formality and that it was nothing to worry about. Plaintiffs were also concerned by the fact that the loan was structured for one year. Jinings stated that that was also a formality and that defendant would roll over the balance from year to year until the loan was paid off. On those assurances, plaintiffs signed the documents.

Despite defendant's representations to plaintiffs that the operations were going well, defendant identified the loan as a "problem" from the beginning, because it was set up to purchase real estate on 100 percent credit and because the value of the cattle, which was defendant's primary security for payment of the loan, was less than the loan balance. When the first year's loan became due, defendant agreed to roll over the entire balance and to loan additional funds for capital expenditures and other items. However, plaintiffs disagreed with defendant's valuation of the cattle; in addition, defendant refused to loan sufficient funds to enable plaintiffs to

---

[2] Wrench Ranch started borrowing from Central Oregon Production Credit Association (COPCA) in Redmond. In 1985, COPCA merged into Interstate Production Credit Association of Spokane, which we refer to as defendant throughout.

restock culled cows fully and also refused to allow plaintiffs to begin a yearling operation.

In a credit review in January, 1982, the Federal Intermediate Credit Bank (FICB), which had supervisory authority over defendant, criticized defendant for overextending credit for expansion, including the purchase of real estate. In response, defendant tightened its lending practices and advised FICB that it no longer would lend money for down payments on real estate or annual real estate payments. In 1983, consistent with that new practice, defendant agreed to renew plaintiffs' loan only on the condition that plaintiffs Fewel give a second mortgage on their Washington ranch and declined to lend money in that year for the restocking of cattle or for the Coleman Ranch payment. It agreed to advance funds for the Wrench Ranch annual payment, but only on the condition that the Fewels make the payment thereafter.

By May, 1983, in an internal analysis, Jinings mentioned the possibility of liquidating the Coleman Ranch as a means of avoiding the sale of part of the Wrench Ranch or refinancing. Despite that, defendant considered plaintiffs' loan performance to be acceptable in 1984 and agreed to renew the loan balance and to loan funds for the Coleman Ranch payment and for the purchase of 100 cows. Even with that purchase, the ranches, which had a capacity for 1400 cows, were understocked with only 1124 head. Defendant still considered the loan to be a problem, and internal documents show that it began seriously to explore the possibility of liquidation of the Coleman Ranch.

In 1985, defendant agreed to extend the previous year's loan on the condition that plaintiffs dispose of the Coleman Ranch and liquidate its assets. Plaintiffs agreed, executed a deed to the Coleman Ranch in lieu of foreclosure and sold the cattle and equipment relating to that ranch.

In 1986, defendant again renewed the loan in the amount of the remaining balance, plus additional funds for operating Wrench Ranch. At defendant's request, plaintiffs executed a new mortgage on Wrench Ranch that secured advances for up to five years in an aggregate amount not to exceed $2,000,000. The loan agreement called for plaintiffs to submit a plan to "restore primary security," in the absence of

which the loan would be submitted to the loan committee for "collection review." To restore defendant's primary security, plaintiffs proposed a restocking of Wrench Ranch to full capacity, the running of yearlings, the selling of recreational rights to the ranch and participation in the "Natural Beef Program." Defendant rejected each of those proposals.

In January, 1987, while plaintiffs' loan renewal application was pending, defendant began to demand liquidation of cattle on the Wrench Ranch. In the meantime, Mr. Fewel had asked for a subordination of defendant's second mortgage on his Washington ranch, so that he could obtain a loan for its operation. On defendant's promise to subordinate, the Fewels verbally agreed to liquidate cattle on the Wrench Ranch. Defendant delayed providing the subordination agreement, insisting that the Fewels give a mortgage on their Washington home to secure the repayment of the Wrench Ranch loan. Given that new demand, the Fewels no longer felt bound to their agreement to liquidate the cattle on that ranch.

In March, 1987, plaintiffs and Fewels' attorney met with defendant's attorney and Biggers, defendant's manager. Biggers told plaintiffs that, if they did not agree to liquidate the cattle on the Wrench Ranch, defendant would commence foreclosure. In June, defendant agreed to advance $35,500 to plaintiffs for the Wrench Ranch payment, if plaintiffs would agree to sell cattle in that amount and to remit the proceeds to defendant.

The addendum to the loan agreement signed June 12, 1987, called for plaintiffs to submit an operating plan "acceptable" to defendant by September, 1987. In response, plaintiffs suggested several options, all of which were rejected by defendant. In September, plaintiffs received a letter from defendant indicating that the deadline for submitting a plan was approaching and that foreclosure would result if no plan was submitted.

Plaintiffs filed this action, claiming that defendant had breached its oral agreement to continue to finance the Coleman and Wrench Ranches for a period of 15 years. They further claim that, in the course of dealings over the years, defendant had breached its duty of good faith under the oral

agreement. The court submitted both claims to the jury, which returned a verdict for plaintiffs.

The major underlying issue is whether the evidence of the circumstances surrounding the parties' agreement and of the alleged oral agreement should have been excluded because of the Parol Evidence Rule. ORS 41.740. That question was raised by defendant's pretrial motion *in limine,* which was denied, and by defendant's motion for directed verdict at the close of plaintiffs' case and renewed at the close of all of the evidence. The pretrial motion was properly denied, because that evidence was admissible under plaintiffs' fraud claim. However, once the fraud claim was dismissed, the evidence was no longer admissible to support that claim, and defendant's motion squarely raised the issue. If the evidence should not have been admitted in support of the contract claim, defendant was entitled to a directed verdict.

■    ORS 41.740 provides, in part:

"When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be * * * no evidence of the terms of the agreement, other than the contents of the writing * * *. However this section does not exclude other evidence of the circumstances under which the agreement was made, or to which it relates, as defined in ORS 42.220 * * *."

As we said in *O'Meara v. Pritchett,* 97 Or App 329, 333, 776 P2d 866, *rev den* 308 Or 465 (1989), the statute has never been understood to mean "all that its words would be taken to mean in ordinary usage." It bars admission of evidence of an alleged oral agreement made before the written agreement *only if* the parties intended the writing to be the final and complete expression of their agreement. *Hatley v. Stafford,* 284 Or 523, 588 P2d 603 (1978). Whether the writing was intended as the final and complete expression of the parties' agreement is for the court to decide. 284 Or at 532.

■    How the court goes about deciding that question is less clear. According to *Hatley v. Stafford, supra,* the court may consider all relevant evidence, including whether the parties were represented by counsel, the relative bargaining strength of the parties, whether the contract is one of adhesion and whether a "literal reading of the written contract

would have led to an unreasonable result." 284 Or at 536. However, the court does not decide whether the alleged oral terms actually were agreed upon or whether the evidence of the circumstances surrounding the making of the agreement is true. It merely decides whether there is "substantial evidence" to support its conclusion that the parties did or did not intend the writing to be the final and complete expression of their agreement. 284 Or at 535.

3.     Parties may intend that a certain document be the final expression of their agreement as to the matters dealt with in the writing, but may not intend the writing to represent their entire agreement. If that is the case, their agreement is not complete, but is only partially integrated, and prior consistent additional terms not evidenced by the writing may still form part of their overall agreement. *Howell v. Oregonian Publishing Co.,* 82 Or App 241, 245, 728 P2d 106 (1986) *mod* 85 Or App 84, 735 P2d 659, *rev den* 303 Or 699 (1987). In such circumstances, the criteria stated in the *Restatement of Contracts,* § 240, apply in determining the admissibility of evidence of the prior agreement. *See Hatley v. Stafford, supra,* 284 Or at 532; *Caldwell et ux v. Wells,* 228 Or 389, 395, 365 P2d 505 (1961). Section 240 provides, in part:

"(1)   An oral agreement is not superseded or invalidated by a subsequent or contemporaneous integration, nor a written agreement by a subsequent integration relating to the same subject-matter, if the agreement is not inconsistent with the integrated contract, and

"* * * * *

"(b)   is such an agreement as might naturally be made as a separate agreement by parties situated as were the parties to the written contract."

■    When the evidence and circumstances surrounding the execution of the document show that the parties intended the writing to be only a partial integration, evidence of a prior agreement is admissible if it is not inconsistent with the partially integrated document and if it is such an agreement that might naturally have been made as a separate agreement by the parties under the circumstances. *See Hatley v. Stafford, supra,* 284 Or at 533.

The 1981 writings are the starting point for determining whether the parties intended a complete integration.

The first loan application completed by plaintiffs in 1981 states: "[T]his Application and initial schedules * * * combine to set forth the entire agreement between Applicant and Association."[3] The note must also be considered to be part of the writings, and its due date was within one year of its date. None of the writings said anything about renewing the loan annually.[4] Although the merger clause is an indication that the writings were intended to be a complete integration, it is not conclusive.

■    The documents themselves show that they were not intended to contain the entire agreement of the parties. The annual cash flow and budget forms, which were stated to be part of the loan agreement from the beginning, clearly show that sufficient income would not be generated to pay the initial loan or any of the renewal loans at their respective maturity dates. None of the budgets that plaintiffs submitted to defendant at the time of the original and renewal loans shows an anticipated pay off at the year end; they show a

---

[3] In subsequent years, the loan documents began to deal with renewal of the loan. The 1984 agreement provided:

"(c) Borrower understands and agrees that, at maturity of Borrower's loan, if primary margins are not satisfactory, based upon Association's sole discretion, future financing will be very doubtful."

It also stated that "additional advances or increased commitments for any purpose are not contemplated at this time."

In 1985, when defendant loaned plaintiffs only $60,000 for the operation of the Wrench Ranch only, the agreement stated:

"The borrower specifically agrees that it is not relying on any future renewal or extension of the indebtedness the borrower currently has with the Association after December 15, 1985. No representations of such an extension or renewal have been made to the borrower by the Association."

Defendant does not contend that the original loan agreement was modified. Rather, its position is that evidence of the oral agreement is not admissible.

[4] The security agreement provided that it was given to secure repayment "of all additional advances or loans" in addition to the amount of the loan represented by the note. It also provided that

"nothing herein contained shall be construed to obligate the secured party to make any loans or advances to the debtor and that the sole purpose of this agreement is to provide collateral security for presently existing indebtedness and for loans and advances which, in the absolute discretion of the secured party, may hereafter be made to the debtor."

The deed of trust on the Wrench Ranch stated that it was given to secure payment of not to exceed $2,000,000. Those documents were not stated to be part of the loan agreement and, in any event, their purpose was to provide defendant with security for repayment of any amounts that it might loan, up to the stated maximum.

substantial unpaid balance. To the extent that they do not explain how the loans are to be satisfied on their respective maturity dates, the documents are incomplete and the parties could not have intended them to constitute their entire agreement.

Additionally, the evidence concerning the circumstances surrounding the negotiations and execution of the written documents shows that the parties intended that the loan would be renewed over the long term. It would have been highly unlikely for either plaintiffs or defendant to have agreed to a loan for only one year that would not be paid when due. If that were the agreement, plaintiffs would have purchased the Coleman Ranch with the virtual certainty that they would lose it, as well as other assets, at the end of one year. By the same token, defendant would have made a loan on which it knew it would be required to foreclose at the end of the year. The documents and the circumstances surrounding their execution require the conclusion that the documents, which made no mention of annual renewals, did not contain the complete agreement of the parties and that they were not intended to represent a complete integration of the agreement.

██ Under the *Restatement* test, the next question is whether a separate oral agreement to renew the loan annually over the long term was inconsistent with the writings providing for one year loans. To be inconsistent within the meaning of the partial integration doctrine, the oral terms must contradict an *express* provision in the writing. *Hatley v. Stafford, supra,* 284 Or at 533. That is not the case here. Also, given defendant's lending policies and the nature and volatility of the cattle business, it was natural for defendant to prepare the loan documents on an annual basis, but to agree separately that the loan would be renewed annually over the long term. Considering the differences in the parties' bargaining positions, it was reasonable for plaintiffs, who were not represented by counsel, to accept defendant's representations that the fact that the note was written as a one-year obligation was just a formality and would not alter the parties' understanding that the loan would be rolled over from year to year. Although the amounts required to pay off the obligations on both ranches were fixed, the amounts required

to stock and operate the combined ranches varied from year to year and were to be worked out by the parties when plaintiffs submitted their proposed budget for the ensuing year. That arrangement also gave defendant some control over the manner in which plaintiffs operated the ranches.

*Willamette Prod. Credit Ass'n v. Day,* 167 Or 451, 118 P2d 1058 (1941), on which defendant relies, is distinguishable. There, farmers had borrowed money from a production credit association for one year for the production and harvesting of the 1937 hop crop. When the association denied additional funding for the subsequent season, the farmers complained that they had an oral agreement with the association to provide additional funds for another crop season. The court held that the Parol Evidence Rule barred evidence of the oral agreement to loan additional funds, because that agreement would be inconsistent with the parties' written contract, which expressly limited the loan to a specific term and amount. The court was not impressed by the farmers' argument that the evidence of the oral agreement should be considered because the mortgage securing the loan stated that "advances are contemplated hereunder":

"[The borrowers] seek by parol evidence to remove from the mortgage the limitation of $2,000 on future advances and to substitute therefor an indefinite amount, to-wit: a sum sufficient to cultivate and harvest their 1938 crop. They would also vary the terms of the mortgage which make any future advances by the mortgagee optional, by substituting therefor an oral stipulation requiring the mortgagee to advance to them whatever sum they might need for cultivating and harvesting their 1938 crop." 167 Or at 457.

The "future advances" clause was the only evidence in the farmers' favor. Here, in contrast, the writings themselves are incomplete concerning satisfaction of the loan. Additionally, there is substantial evidence of the extensive negotiations between the parties and of defendant's assurances of long term financing to permit plaintiffs to purchase the Coleman Ranch that support the conclusion that the parties did not intend the writings to be fully integrated. The trial court did not err in denying defendant's motion for a directed verdict on the ground that the Parol Evidence Rule precluded plaintiffs from proving their claim for breach of the oral agreement to renew the loan over the long term on an

annual basis and in permitting the jury to consider evidence for the purpose of establishing the oral agreement.

■   In its third assignment of error, defendant contends that the court erred in submitting the question of integration to the jury. As we said in *O'Meara v. Pritchett, supra:* "[T]he law commits the determination of the parties' intent with respect to integration to the trial judge * * *." 97 Or App at 336. The court considered the question at length and apparently concluded that it was necessary to decide questions of fact relating to the negotiations and circumstances surrounding the agreement, including the alleged oral agreement, before it could be determined whether the parties intended the written documents to be a complete integration of their agreement. Accordingly, it ruled that the Parol Evidence Rule did not require the exclusion of plaintiff's evidence and concluded that the questions of fact had to be resolved by the jury. It instructed the jury:

> "Some of the documents involved in this case contain integration clauses. An integration clause refers to language in a writing or writings adopted by the parties contracting, whereby the parties state that the writing is the final and complete expression of the parties' agreement. *Whether the parties in this case intended to integrate their agreements as final agreements will be a question of fact which you will be called upon to determine in this case. Whether the parties intended to make an integrated written contract depends upon the surrounding circumstances, as well as the written agreement itself.*" (Emphasis supplied.)

In deciding defendant's motion for a directed verdict, the court was required to decide whether there was substantial evidence to support its conclusion that the parties did or did not intend the writings to be a complete integration of their agreement. If it concluded that they did so intend, parol evidence was not admissible and defendant's motion should have been granted; if they did not, it was admissible, and defendant's motion was properly denied. However, the question of integration was not for the jury.

Although the court erred, the error was harmless. It is clear from the court's discussion that, if it believed plaintiffs' evidence, the parties did not intend a complete integration. However, it was not necessary for the court to decide

whether plaintiffs' evidence was true; it was only necessary to decide whether there was substantial evidence that the parties did not intend that the writings be a complete integration of their agreement. We believe that the only conclusion that the court could have reached on this record is that there is substantial evidence that the parties did not intend a complete integration. For that reason, defendant was not only not prejudiced by the court's submitting the question to the jury, it actually got two bites of the apple: The jury could have decided the question in defendant's favor.

Next, defendant contends that, even if the evidence concerning the alleged oral agreement was admissible, the agreement was too indefinite to be enforced, and the trial court erred in submitting the claims for damages to the jury. Plaintiffs alleged that defendant agreed to "continue to finance the [Coleman] Ranch purchase and the Wrench Ranch operating expenses upon the terms described over a long period of time, as long as plaintiffs continued to operate in an efficient, honest and competent manner according to the highest standards of husbandry prevailing in the area * * *."

■ Defendant contends that that alleged agreement was indefinite as to four terms: The amount of the loan, the interest rate, the repayment schedule and the term of the loan. However, as plaintiffs argue, the fact that the parties have not expressly set forth all of the terms of their agreement does not, in and of itself, mean that the contract is unenforceable, so long as there is an objective method agreed upon by which the parties can settle the terms as a matter of fact. *Adair Homes, Inc. v. Jarrell,* 59 Or App 80, 650 P2d 180 (1982). Viewing the evidence in the light most favorable to plaintiffs, we are satisfied that the parties had agreed on methods by which the essential terms could be settled.

■ In deciding the question of definiteness, the oral agreement to renew the loan over the long term should not be viewed in isolation. After all, as plaintiffs pleaded and proved, it evolved out of the same circumstances as, and was an unwritten component of, the written documents. Many, if not most, of the essential terms can be derived from the writings. As defendant admitted, the interest rate was not a subject for

negotiation, but was set from time to time by federal requirements. There was evidence that defendant made assurances that it would renew the annual loans over a 15-year period to permit plaintiffs to complete their purchase of the Coleman Ranch; that defendant agreed to lend an amount sufficient to operate both ranches annually, including funds to make the payments due on the real estate, to pay for operations and to keep the ranch properly culled and fully stocked with cattle; and that those amounts could be determined objectively, based on plaintiffs' proposed annual budgets showing the needs of the ranches as determined by the parties in good faith. Other terms, including the method of repayment, could be derived from the writings. We conclude that the alleged oral agreement was sufficiently definite to permit the court to submit the claim for damages to the jury.

■■ ■■ In its fifth assignment of error, defendant contends that the trial court erred by failing to instruct the jury on what are considered to be the "normal terms of a loan agreement." The trial court instructed the jury that

"[b]efore a contract can be created, there must be an agreement between the parties on all essential terms. No material terms can be left to further negotiation.

"An oral promise or representation sought to be enforced as a contract, which is not contained in writing, must be certain and definite in all essential particulars including, for purposes of this case, the normal terms of a loan agreement."

In its oral exception to the instruction, defendant contended that the court gave complete discretion to the jury to decide in retrospect what the contract of the parties was or should have been. In a written objection, it contended that the court should at least have instructed the jury that the oral contract must have been explicit with respect to the precise amount of the loan, interest rate, repayment schedule and the term. We agree with plaintiffs that the first part of defendant's exception was too general to advise the court of its alleged error. The second portion was also properly rejected by the court, because it is an incorrect statement of the law. As we have held, there is no requirement that a contract be explicit or precise with regard to the items listed, so long as the parties have agreed to a method for determining the performance agreed to by the parties.

■ Defendant's sixth, seventh and eighth assignments of error relate to the Statute of Frauds. Defendant moved for a directed verdict on the ground that the alleged oral contract, requiring performance over a 15-year period, is void, because it is not in writing. The court denied the motion. ORS 41.580(1) provides, in part, that

"[i]n the following cases the agreement is void unless it, or some note or memorandum thereof, expressing the consideration, is in writing and subscribed by the party to be charged, or by the lawfully authorized agent of the party; evidence, therefore, of the agreement shall not be received other than the writing, or secondary evidence of its contents in the cases prescribed by law:

"(a) An agreement that by its terms is not to be performed within a year from the making."

A contract covered by the Statute of Frauds that does not comply with the statute "is a nullity in all respect[s] and for all purposes." *Hearn v. May et al,* 207 Or 514, 518, 298 P2d 177 (1956). However, like the Parol Evidence Rule, the Statute of Frauds is seldom applied according to its literal terms. For example, a contract that would be void under a literal reading of the statute is rendered enforceable in equity if the party seeking to avoid the statute has partially performed the oral contract. *Engelcke v. Stoehsler,* 273 Or 937, 944, 544 P2d 582 (1975).

■ Additionally, in an action at law, a party may be estopped, in appropriate circumstances, from asserting the Statute of Frauds. In *Conklin v. Karban Rock, Inc.,* 94 Or App 593, 596, 767 P2d 444 (1988), *rev den* 307 Or 719 (1989), we stated the elements of estoppel in that context:

"(1) [T]here must be a false representation; (2) it must be made with knowledge of the facts; (3) the other party must have been ignorant of the truth; (4) it must have been made with the intention that it should be acted upon by the other party; and (5) the other party must have been induced to act upon it."

Contrary to defendant's argument, the misrepresentations forming the basis for the estoppel need not be extrinsic to the agreement itself. They can relate to the promisor's intentions regarding its performance under the alleged oral agreement,

if the promisor gains an advantage by making the oral promise on which the plaintiff relies to his detriment. *Conklin v. Karban Rock, Inc., supra,* 94 Or App at 598; *see Stevens v. Good Samaritan Hosp.,* 264 Or 200, 204, 504 P2d 749 (1972); *United Farm Agency v. McFarland,* 243 Or 124, 411 P2d 1017 (1966).

▮ Defendant contends that there was no evidence from which the jury could find an estoppel. However, there was evidence from which the jury could find: Defendant promised plaintiffs that it would loan money over the long term for the purchase of the Coleman Ranch and for the operation and annual payments of both ranches, knowing that that was against its policy and practice; plaintiffs reasonably believed defendant's officers that defendant could make the loan that it had solicited; in reliance on defendant's promise, plaintiffs agreed to purchase the Coleman Ranch, paid earnest money, entered into a financing agreement with defendant, committed all of the assets of the Wrench Ranch as security for the loan and borrowed sufficient funds from defendant to purchase the Coleman Ranch and to stock, equip and operate the combined ranches; and defendant benefitted from those actions by obtaining continuing loan business from plaintiffs and by obtaining security worth over $1.5 million and $705,357 in interest payments. Because we conclude that there was sufficient evidence from which the jury could find that defendant was estopped from raising the Statute of Frauds as a defense, the trial court did not err in denying the motion for a directed verdict on that basis.[5]

The court instructed the jury:

"Generally, a contract which is not to be performed by its terms within one year, must be in writing and signed by the party to be charged, in order to be enforceable. However, under some circumstances there are exceptions to the general requirement for a writing; for example, partial performance of the alleged agreement. However the type of part performance which — which will result in an exception to the general requirement for a writing, must be performance of such a nature that such performance would not have taken place, but for the existence of the oral contract alleged. Such

[5] We reject defendant's contention that the estoppel exception to the Statute of Frauds was not properly considered by the trial court.

performance must be unequivocally referable to the alleged oral contract and inure to the benefit of the Defendant. A party will not be allowed to assert the need for a writing, if the other party has acted to such party's detriment solely in reliance on an oral agreement."

Defendant excepted to the instruction:

"We take exception [to] * * * these instructions, * * * [including] taking the case out of the statute of frauds, we think that particular instruction where it says, '* * * performance must be unequivocally referable to the alleged oral contract * * *', it does not really explain that, if the performance is equally referable to the written contract, then there can be no submission of an oral contract. And to add to that this phrase that, '* * * A party will not be allowed to assert the need for a writing if the other party has acted to the party's detriment solely in reliance on an oral agreement', I think incorrectly states the law that has developed in this state."

On appeal, defendant contends that the instruction was wrong for a different reason: It permitted the jury to find for plaintiffs on the basis of the doctrine of part performance, which does not apply to legal actions. *See Engelcke v. Stoehsler, supra,* 273 Or at 944. Defendant failed to raise that argument in the trial court, and we decline to address it.

Defendant's ninth, tenth and eleventh assignments of error relate to the trial court's denial of its motion for directed verdict on the claim of breach of the obligation of good faith and fair dealing, its denial of the motion *in limine* excluding evidence concerning that claim and its instructions to the jury. The court instructed the jury:

"There is an obligation of good faith in the performance of every contract. The concept of 'good faith' applies only to performance of a contract, once there is in fact a meeting of the minds on the elements of a contract. Good faith performance of a contract emphasizes faithfulness to an agreed common purpose and consistently with the justified expectations of the other party. 'Good faith' * * * excludes a variety of types of conduct characterized as involving 'bad faith', because such conduct violates community standards of decency, fairness, or reasonableness. Subterfuges and evasions violate the obligation of good faith in the performance of agreements, even though the actor believes the conduct to be justified. It is not possible to catalogue all conduct which

might constitute bad faith within the context of a particular type of contract. However, with respect to contracts in general, when one party to a contract is given discretion in the performance of some aspect of a contract, the parties ordinarily contemplate that the discretion will be exercised in a manner consistent with the particular purposes of the contract. If the discretion is exercised for purposes not contemplated by the parties, the party exercising discretion has performed in bad faith. Whether the obligation of good faith has or has not been met in this case, should be determined by deciding what the reasonable contractual expectations of the parties were."

Defendant's first objection to the instruction was that it failed to advise the jury that "good faith applies solely to performance, not the execution of the contract." The instruction adequately advised the jury on that point.

Defendant's second objection was that the court failed to advise the jury that the performance of matters contracted for is never in bad faith; *i.e.,* that, if defendant's performance was in compliance with the written documents, it could not have been in bad faith. That argument, as well as the others made in the context of these three assignments of error, are premised on the contention that the doctrine of good faith should not be permitted to allow the parties to "imply" contract terms that are inconsistent with the express terms of the writings. *Sheets v. Knight,* 308 Or 220, 779 P2d 1000 (1989). Although that statement is correct as a general principle, in this context it merely begs the question of whether the oral agreement existed. As we have held, there is evidence from which the jury could find that, in addition to the writings, defendant agreed to lend money to plaintiffs over a 15-year period so long as plaintiffs continued to operate the ranch in an efficient, honest and competent manner according to the highest standards of husbandry prevailing in the area. The instruction and the court's rulings on the question of the good faith claim were proper as they pertained to the alleged breach of that oral agreement. In a similar vein, defendant contends that, in submitting the good faith claim to the jury, the court effectively permitted the jury to disregard the writings on the basis of unconscionability. That argument was not made to the trial court, and we will not consider it.

Defendant also contends that the evidence was inadequate to support many of the individual allegations of breach of the duty of good faith with respect to the alleged oral agreement or that, for other reasons, those allegations should not have been submitted to the jury. Once again, the contentions are premised primarily on the argument that the oral agreement was inconsistent with the express terms of the writings, which we have already rejected. Additionally, defendant did not object to the court's summary of each of those allegations to the jury; it may not object on that basis now.

The remaining contentions relating to the eleventh assignment of error do not merit discussion.

Defendant's twelfth and thirteenth assignments of error relate to the court's denial of its motion for directed verdict and to the jury instructions on the question of damages. The court instructed the jury that plaintiffs were entitled to damages for lost profits, *i.e.*, consequential damages, if they could establish that the loss was caused by defendant's breach. It permitted the jury to consider damages as a result of payments made toward the equity in the Coleman Ranch, lost profits on the Coleman Ranch because of the forced sale of that ranch and lost profits arising from ranching operations, including defendant's failure to permit a yearling operation.

■ ■ The standard measure of damages for breach of a contract to loan money is the loss sustained by the borrower through the breach of the alleged agreement, ordinarily consisting of the difference between the interest rate promised and the rate which the borrower would have to pay elsewhere. *Investment Service Co. v. Smither,* 276 Or 837, 556 P2d 955 (1976); *Bixler v. First National Bank,* 49 Or App 195, 200, 619 P2d 895 (1980). Consequential damages are also available if the lender knew of facts making the loss foreseeable at the time the contract was made. *Bixler v. First National Bank, supra,* 49 Or App at 200. Defendant contends that any consequential damages suffered by plaintiffs were not foreseeable, because there was no evidence from which it could be found that defendant knew at the time the first loan agreement was negotiated that plaintiffs would lose profits if defendant chose not to finance a yearling operation or from

which it could know that alternate financing would not have been available to plaintiff.

As we have said, the jury could find that the funding of a yearling operation was discussed during pre-loan negotiations, that defendant agreed that plaintiffs would have the option to sell yearlings and that it agreed to fund such an operation. Defendant's contention that it could not have foreseen the lack of available alternate financing is also without merit. There is evidence from which the jury could find that defendant was aware of the lack of such funding and that it, in fact, marketed its loan to plaintiffs on the basis that it could fill a need that could not otherwise be met by the market. Defendant makes no separate argument with respect to the jury instruction.

In its fourteenth assignment of error, defendant contends that the trial court erred in denying defendant's motion to strike plaintiffs' claim for out-of-pocket damages resulting from the loss of the down payment and annual payments on the Coleman Ranch. It contends that plaintiffs suffered no loss, because they had borrowed the funds for those payments and had never paid them back. We agree with plaintiffs that defendant did not adequately preserve that error below.

In its fifteenth assignment of error, defendant contends that the court erred in granting plaintiffs' motion for prejudgment interest on the grounds that the complaint did not claim it, the jury did not award it and the court may not award it if the jury did not. However, at the close of all of the evidence and before the case was submitted to the jury, plaintiffs moved to amend their complaint to include a claim for prejudgment interest. Although defendant objected to the proposed amendment, it did not make the objections that it now makes. In fact, it waived any error by tacitly approving the court's proposed procedure for dealing with the request for prejudgment interest after the jury verdict. It also failed to preserve its contention that prejudgment interest should run from the date of the first demand rather than from the date of default.

Finally, defendant contends that there was no basis on which the court could award plaintiffs attorney fees,

because they have not brought this action, or prevailed, on the written documents, which contain provisions for attorney fees. Instead, defendant argues, plaintiffs have established the existence of an oral contract, which contains no provision for attorney fees. Plaintiffs contend that the objective of their claims has not been to disavow the writings or to establish a separate contract, but to establish that the actual agreement of the parties was broader than that contained in the written documents. They claim that, in establishing the existence of the oral agreement that supplemented the written one and its breach, they are entitled to attorney fees as provided in the written documents, which continue to be part of the contract. We agree. The trial court found that "[t]he documents relating to [plaintiffs'] yearly production credit loans provided for an award of reasonable attorney fees to a prevailing party."[6] Plaintiffs have succeeded in persuading the jury that their agreement was partly in writing and partly oral and that defendant breached that agreement. Because the written portion of the agreement provided for attorney fees, plaintiffs are entitled to them for having prevailed on their claim for breach of the agreement. *See Jewell v. Triple B. Enterprises,* 290 Or 885, 626 P2d 1383 (1981).

We also conclude that the trial court acted within the range of its discretion in setting the amount of the fees.

Affirmed.

---

[6] Defendant now questions the basis for that finding, contending that, aside from provisions in the notes and security agreements, which it contends are not applicable here, *see Greenwade v. Citizens Bank of Oregon,* 50 Or App 395, 624 P2d 610 (1981), plaintiffs have never identified documents that provide for attorney fees on their claims. Defendant did not object on that basis below, and we decline to consider the argument now.