**Pierre ARBOIREAU and Sandrine Arboireau, Plaintiffs–Appellants,**

v.

**ADIDAS–SALOMON AG, a foreign corporation; and Adidas America, Inc., a Delaware corporation, Defendants–Appellees.**

No. 02–35398.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 12, 2003.

Filed Oct. 30, 2003.

John Folawn, Lane Powell Spears Lubersky LLP, Portland, OR, for the plaintiffs-appellants.

Timothy R. Volpert, Davis Wright Tremaine LLP, Portland, OR, for the defendants-appellees.

Before ALDISERT,* GRABER, and GOULD, Circuit Judges.

GOULD, Circuit Judge:

This diversity case involves claims of breach of contract and intentional misrepresentation arising out of a failed employment relationship. The district court granted summary judgment for defendants on all claims. We affirm in part, reverse in part, and remand.

**I[1]**

Appellant Pierre Arboireau ("Arboireau") worked in France for Salomon

---

* The Honorable Ruggero J. Aldisert, Senior Judge of the United States Court of Appeals for the Third Circuit, sitting by designation.

1. Because this case was decided on summary judgment against Appellants, we state the facts in the light most favorable to Appellants. *See Meade v. Cedarapids, Inc.,* 164 F.3d 1218, 1221 (9th Cir.1999).

Group, a subsidiary of adidas-Salomon AG. Around July 1999, Arboireau was contacted by Yannick Morat, who was leaving his position in Portland, Oregon, as Head of Worldwide Footwear Costing for adidas America (hereinafter "the Position"), another subsidiary of adidas-Salomon AG. Morat invited Arboireau to apply for the Position. Morat, Arboireau, and Arboireau's wife Sandrine discussed the stability of the Position. In August 1999, Arboireau flew to Oregon and interviewed with, *inter alia*, Brian Mignano, supervisor of the Position. During the interviews, Mignano expressed that he was dissatisfied with Morat's decision to leave the Position after only a few months. Mignano repeatedly emphasized that he was seeking someone who would commit to stay in the Position for at least two, preferably three, years. During the interviews, Arboireau expressed the importance to him of the stability of the Position, especially because Sandrine would be taking leave from her job and because they would be moving their children. Mignano wanted to fill the Position quickly. He never mentioned the possibility of the Position's moving to Germany at any point in the interviews or during later communications in the recruiting process.

On September 3, 1999, after receiving permission from his supervisor, Mignano telephoned Arboireau at his home and offered him the Position. During the call, Mignano discussed salary and benefits. Mignano again said that he wanted Arboireau to stay in the Position for at least 24 months, but preferably three years. Mignano did not guarantee or promise that Arboireau would have the Position for at least 24 months. The Arboireaus, on the other hand, were under the impression that the offer was for a minimum of 24 months. On the same day, Mignano sent Arboireau an e-mail stating that Yvonne Valentino, the Human Resource Manager, would send "a letter outlining the proposal in more detail" and offered to "discuss any concerns."

On September 7, 1999, Arboireau sent an e-mail to Mignano stating, "I accept your proposal" for the Position. Arboireau summarized points including salary, seniority status, and relocation expenses. Arboireau wrote, in the summary section, "Minimum duration: 24 months." Arboireau added after his summary, "I know it's not an exhaustive list, and I'm waiting for the confirmation letter of Portland Human Resources you told me about."

On September 8, 1999, Mignano sent Arboireau an e-mail containing a "preliminary proposal" that needed to be verified with "HR and legal." The draft proposal deemed the employment "at will" and defined the term in detail in the middle of a later paragraph. On September 17, 1999, Valentino sent an e-mail to Arboireau that included an offer letter "based on the agreement you have made with [Mignano]." The offer letter stipulated, and included an explicit definition of, "employment at-will." On September 20, 1999, Arboireau sent an e-mail with several questions to Valentino about the offer letter, including eligibility for a stock option program; length of paid vacation; whether participation in a 401(k) was mandatory; details of the health, dental, and vision programs; and the amount of "social contributions" to be paid. These questions were answered. On October 12, 1999, Arboireau sent an e-mail to Mignano and Valentino, noting that they had answered many of his questions, asking for the contents of the health benefits package and the employee handbook, and advising that he had not received the offer letter.

Valentino responded on the same day that she had compiled a package that would be sent that day with the offer letter, a non-competition agreement, an employee handbook, and 401(k) and medi-

cal information. Arboireau received the package on October 14, 1999, and, after reviewing it with his spouse, signed the offer letter and non-competition agreement on October 22, 1999. Arboireau began work on January 5, 2000.

After Arboireau began work, he discovered "a lot of pressure" to move the Position to Germany because it would provide better support to both corporate entities—adidas America and adidas-Salomon. As a result of corporate changes that began in November 1999, Arboireau had a new supervisor, Bob Shorrock, confirmed on June 1, 2000. Jay Pollard was offered the Position, which was relocated to Germany, in Shorrock's subsequent reorganization. Shorrock informed Arboireau of his termination, effective June 22, 2000, on June 9, 2000. Arboireau's employment continued until July 28, 2000. Despite Shorrock's having received complaints about Arboireau prior to Shorrock's June 1, 2000, promotion, the termination was not for cause, but was to transfer the Position to Germany.

The Arboireaus ("Plaintiffs" or "Appellants") filed a complaint against adidas-Salomon AG and adidas America ("Defendants" or "Appellees") with eight claims for relief, including breach of contract and intentional misrepresentation. The parties consented to the magistrate judge's exercise of civil jurisdiction over the case in accordance with Fed.R.Civ.P. 73 and 28 U.S.C. § 636(c). The magistrate judge, upon motion of the Defendants, entered summary judgment for the Defendants on all eight claims and dismissed the complaint with prejudice. This appeal, contesting only the summary judgment on the breach of contract and intentional misrepresentation claims, followed. We have jurisdiction pursuant to 28 U.S.C. § 1291 and conclude that, though summary judgment for Defendant was appropriate on

most claims, one of Appellants' claims must be remanded for trial.

## II

██ The district court's decision to grant summary judgment is reviewed de novo. *See Oliver v. Keller,* 289 F.3d 623, 626 (9th Cir.2002). We use the standard in Fed.R.Civ.P. 56(c). *See, e.g., Ghotra v. Bandila Shipping, Inc.,* 113 F.3d 1050, 1054 (9th Cir.1997). We must determine, "viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact" under the applicable substantive law. *Meade v. Cedarapids, Inc.,* 164 F.3d 1218, 1221 (9th Cir.1999). We do not weigh the evidence, but we consider whether a rational trier of fact might resolve the issues in favor of the nonmoving party. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630–31 (9th Cir.1987).

## III

We first address whether the district court correctly awarded summary judgment to Appellees on the breach of contract claim. If the contract was formed by Arboireau's signing the offer letter, then Arboireau's employment was at-will because the offer letter explicitly declared that employment was at-will. If there were any doubt, it would be resolved in favor of employment at-will because employment contracts in Oregon are presumed to be at-will. *Banaitis v. Mitsubishi Bank, Ltd.,* 129 Or.App. 371, 879 P.2d 1288, 1293 (1994). Moreover, the offer letter (and the non-competition agreement) not only stipulated that employment was at-will, but defined what that term meant.

Appellants argue, however, that on September 7, 1999, Arboireau accepted Appellees' oral offer for a minimum of 24 months of employment. Oregon uses an objective theory of contract interpretation. The rule is that "whether the parties entered

into an agreement ... depends on whether the parties agreed to the same, express terms of the agreement." *City of Canby v. Rinkes,* 136 Or.App. 602, 902 P.2d 605 (1995).

■■ Arboireau testified that Appellees made no promises or guarantees of fixed-term employment during the September 3 telephone offer.[2] That undisputed fact is dispositive in precluding the asserted contract claim under Oregon's objective theory of contract. Although there is contested evidence about the Arboireaus' asserted *impression* that Mignano was making a fixed-term offer, their subjective impression does not bear on the words of Mignano's offer. Arboireau's purported acceptance of fixed-term employment on September 7 was necessarily ineffective because the offer was not for a fixed-term. In Oregon, it is settled that "[t]he acceptance of an offer ... must ... correspond to the offer at every point, leaving nothing open for future negotiations." *C.R. Shaw Wholesale Co. v. Hackbarth,* 102 Or. 80, 201 P. 1066, 1067 (1921) (internal quotation marks omitted); *see also Doughty Appliance, Inc. v. White,* 282 Or. 757, 580 P.2d 186, 187 (1978). As of the September 7 discussion much was left open including the yet-to-be delivered "detailed proposal" referenced in Mignano's e-mail of September 3. That e-mail was also followed by nine e-mails between Mignano, Arboireau, and Valentino that covered such issues as the preliminary proposal, the final offer, the stock option plan, vacation, retirement contributions, net salary, and medical coverage. Too much was left

open for future negotiation to permit a conclusion that Oregon law would recognize a contract through the September 7 e-mail responding to the September 3 discussion.

■■ Even if we were to assume that Mignano did make an offer for fixed-term employment, Oregon's parol evidence rule bars the admission of evidence of this alleged oral agreement made before the offer letter was signed if that agreement is used to contradict the offer letter. *See, e.g., State ex rel. Cipriano v. Triad Mech., Inc.,* 144 Or.App. 106, 925 P.2d 918 (1996); *Siegner v. Interstate Prod. Credit Ass'n of Spokane,* 109 Or.App. 417, 820 P.2d 20 (1991). The offer letter's integration clause ("[The letter] is not to be construed as a contract of employment beyond the terms outlined herein") bars the admission of the alleged oral contract preceding the written offer letter.

Appellants offer two arguments to avoid the parol evidence rule. First, they claim that Arboireau signed the contract because the Appellees had misrepresented the offer letter as only a mere formality in the visa process. This argument assumes that, because a signed offer letter was needed for one purpose (the visa), then it could be used only for that purpose. Even if Valentino (and others) had told Arboireau that he had to sign the offer letter to obtain his visa, there is no evidence that Valentino (or others) told Arboireau that this was the *only* function of the offer letter. That Arboireau carefully read the offer letter, asked detailed questions about its contents, and did not consider himself

2. The language of the concession is as follows:

Q: ... Did he [Mignano] say to you, I want you to commit to this job for at least 24 months, or words to that effect?
A: Yes.
Q: Did he say to you, adidas is going to guarantee you this job for at least 24 months, or words to that effect?

A: He didn't precise. In my mind it was the same.
...
Q: Okay. And I appreciate that, but that doesn't really answer my question. My question is: Did he say adidas promises to give you this job for at least 24 months, or words to that effect?
A: No.

bound until "just before he signed [the offer letter]," belie the claim that Arboireau relied on the representation that the letter was only a formality.

■ Moreover, any evidence of fraudulent inducement could not be used to vary the terms of the written contract in this case. The remedy in Oregon for fraud in the inducement is rescission of the contract or affirmation of the contract and subsequent suit for breach. *See, e.g., Eulrich v. Snap–On Tools Corp.,* 121 Or.App. 25, 853 P.2d 1350, 1361 (1993), *vacated and remanded on other grounds,* 512 U.S. 1231, 114 S.Ct. 2731, 129 L.Ed.2d 854 (1994). Arboireau could not claim rescission because he has already affirmed the written contract by accepting severance, outplacement, and relocation compensation after he was terminated. *See Snyder v. Rhoads,* 47 Or.App. 545, 615 P.2d 1058, 1063 (1980). Arboireau is left with the terms of the written contract, terms that he has already enforced.

■ Second, Appellants claim that the offer letter was ambiguous.[3] On its face, the offer letter is for at-will employment. If extrinsic evidence is considered in the

determination of ambiguity, the conclusion does not change.[4] Appellants assert ambiguity because of Arboireau's "cultural ignorance" of at-will employment coupled with his difficulties with the English language. This argument is unavailing.

■ We interpret Oregon law to require that when a sophisticated party chooses to contract in the English language, that party may not use difficulties with the English language as an excuse to avoid the implications of the contract. The party, if sophisticated, must be held to the contract as written in the language accepted by that party. *See Ambrogetti v. Strahorn,* 113 Or. 265, 232 P. 650, 653 (1925) (stating that "when a man sets himself up as a contractor and starts to deal with people, he is ... not to be allowed to use [his limitation with the English language] as an excuse to avoid liability under a valid contract"). Here, Arboireau was contracting for an executive-level position with an international corporation. Both parties were sophisticated and chose to contract in English. Oregon law prevents Arboireau, who chose to contract in English, from using asserted[5] linguistic difficulties to

---

**3.** The determination whether contract language is ambiguous is reviewed de novo. *See United States Cellular Inv. Co. v. GTE Mobilnet, Inc.,* 281 F.3d 929, 934 (9th Cir.2002).

**4.** The Appellants argue for a reexamination of our holding in *Webb v. National Union Fire Insurance Co.,* 207 F.3d 579, 581–82 (9th Cir. 2000), that Oregon law, as elaborated in *Yogman v. Parrott,* 325 Or. 358, 937 P.2d 1019 (1997), does not allow the consideration of parol or other evidence to determine whether a contract is ambiguous. *Webb* held that *Yogman* had implicitly overruled an earlier contrary rule in *Abercrombie v. Hayden Corp.,* 320 Or. 279, 883 P.2d 845, 853 (1994). The Appellants note several Oregon Court of Appeals cases that disagree with *Webb's* holding. *See, e.g., Oregon Trail Elec. Consumers Coop., Inc. v. Co–Gen Co.,* 168 Or.App. 466, 7 P.3d 594, 601 n. 8 (2000); *Portland Fire Fighters' Ass'n, Local 43 v. City of Portland,* 181 Or.App. 85,

45 P.3d 162, 167 n. 6 (en banc), *rev. denied,* 334 Or. 491, 52 P.3d 1056 (2002); *City of Eugene v. Monaco,* 171 Or.App. 681, 17 P.3d 544, 547 n. 7 (2000), *rev. denied,* 332 Or. 240, 28 P.3d 1175 (2001). Our task, in a diversity case, is to predict what the Oregon Supreme Court would do when faced with this precise question. Intervening Oregon Court of Appeals cases would be pertinent to that task. However, because there is no ambiguity even if we were considering extrinsic evidence, there is no need to re-visit this issue.

**5.** Arboireau had more than 360 hours of English training, including 80 hours of English immersion, with a pre-immersion competency level rated between "being able to use English with confidence in moderately difficult situations" and "being able to use English independently and effectively in familiar and moderately difficult situations." In his response to the Immigration questionnaire, Arboireau

avoid the express at-will provision of his employment contract.

Most troubling for the ambiguity claim is that at-will employment was expressly defined in the preliminary proposal,[6] the non-competition agreement,[7] and the offer letter.[8] Appellants' argument that combining a penalty for early termination (repayment of a portion of relocation costs) and a provision for at-will employment in the same contract renders that contract ambiguous is implausible. The express definition of at-will employment is located two pages apart from the penalty for an early termination of employment by Arboireau, and is explicitly defined. The language is explicit, clear, and too pervasive to present any colorable claim of ambiguity. Oregon law holds parties to such clear and explicit contract provisions.

We affirm the district court's grant of summary judgment on the claim of breach of contract.

## IV

We next address whether summary judgment was properly given to Appellees on the two intentional misrepresentation claims. To succeed on a misrepresentation claim, the plaintiff must demonstrate by clear and convincing evidence[9] that (1) defendants made a false representation of material fact; (2) with

knowledge or belief that it was false, or with an insufficient basis for asserting that it was true; (3) with intent that plaintiffs rely on it; (4) that plaintiffs justifiably relied; and (5) plaintiffs suffered consequent damages. *Meade v. Cedarapids, Inc.*, 164 F.3d 1218, 1221 (9th Cir.1999) (citing *Riley Hill Gen. Contractor, Inc. v. Tandy Corp.*, 303 Or. 390, 737 P.2d 595, 604 (1987)). "Nondisclosure of material facts can be a form of misrepresentation where the defendant ... has made representations that would be misleading without full disclosure." *Id.* at 1222; *see also Gregory v. Novak*, 121 Or. App. 651, 855 P.2d 1142, 1144 (1993). The extent to which a representation is misleading, thus imposing a duty of disclosure, is a question of fact. *Gregory*, 855 P.2d at 1144. We assess two theories asserted by the Appellants to see if these elements are met.

## A

Appellants first contend that Appellees failed to disclose that the Position was terminable at any time by either party. First, Appellants argue that Appellees told Arboireau that the offer letter was only pertinent to the visa process and thus Arboireau could not have understood it to modify his understanding from the September 3 conversation. In other words,

---

rated his English ability as "Business" level. And the assertion of cultural ignorance is substantially contradicted not only by Arboireau's demonstrated English skill, but also by Arboireau's study of, and questions about, other provisions in the offer letter.

6. "While it is our intent at this time to keep you in our employ for some time, we cannot guarantee any specific length of employment, just as with any 'at will' employee."

7. The employment was "at-will meaning Employee may voluntarily quit at any time for any reason and Company may terminate Employee at any time with or without cause."

8. The offer letter included: "[O]ur offer of 'at will' employment"; "Since your employment with adidas America is considered 'at-will' employment, you may terminate your employment at any time or the Company may terminate your employment at anytime"; and "While it is our intent at this time to keep you in our employ for some time, we cannot guarantee any specific length of employment, just as with any 'at will' U.S. employee."

9. We take into account the underlying evidentiary standard on the summary judgment motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 244, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Arboireau urges that he was not told he could be fired. Appellants also argue that the offer letter itself did not explain the implication of employment at-will in a manner sufficient to overcome Arboireau's asserted cultural ignorance, linguistic barriers, and impressions created by the telephone conversation with Mignano. Both of these arguments are unavailing for the reasons addressed in Part III. The comment Arboireau made on the length of employment was "Minimum duration: 24 months," which could signal Arboireau's commitment to Mignano not to leave early. No evidence was submitted by Arboireau from which a rational jury could conclude that Defendants intentionally misled him on the nature of at-will employment or that Defendants knew, but ignored, that Arboireau was confused on this key point. This conclusion is supported by the literal terms to which Arboireau agreed and by Arboireau's demonstrated ability to question other provisions in the offer letter.

■ Second, Appellants argue that Appellees' statements on Arboireau's visa application demonstrate an intent for an employment term of three years. The district court, however, reasoned that the standard practice for immigration visas is to state three year employment to avoid annual paperwork. The visa application does not address whether the employment is at-will or term and this information is not volunteered to immigration officials. Moreover, even if Appellees "intended," "expected," or "anticipate[d]" that Arboireau intended to work for three years,

that would not imply a reciprocal commitment of Defendants to a three-year term-employment contract.[10]

■ Appellees adequately disclosed the nature of the employment relationship, primarily in written materials that a senior executive in a substantial business would be charged with reading and understanding. We affirm the district court's grant of summary judgment on Appellants' misrepresentation theory based upon an asserted non-disclosure of the length of employment to which Defendants were committed.

**B** .

■ Appellants advance a second intentional misrepresentation claim that we conclude has more merit. Appellants' second theory of intentional misrepresentation is that, at the time of the interview and offer, the Appellees, aware of the Appellants' desire for a stable job, failed to disclose the "constant pressure" to move the Position to Germany. Appellants urge that, even with no commitment for job duration, Appellees misrepresented the locational stability of the Position for which Arboireau would travel almost halfway around the globe and for which his spouse would give up her position and benefits. This claim is based on *Meade*, 164 F.3d at 1222, which held that Oregon law permits a claim of intentional misrepresentation based on a representation that is made misleading by failure to disclose a "likely material contingenc[y]."

---

10. Appellants argue that the misrepresentations in the visa applications justify judicially estopping the Appellees from challenging the falsity of the representations on the visa applications. But there was no falsity in the visa applications. Appellants' citation to the Mignano deposition that the Appellees did not "have an expectation that ... [Arboireau] would work in the United States for three years" is misleading unless read in conjunc-

tion with Mignano's testimony clarifying his definition of "expectation." Moreover, these representations do not meet the standard of being "tantamount to a knowing misrepresentation to or even fraud on the court" necessary for judicial estoppel. *Johnson v. Oregon*, 141 F.3d 1361, 1369 (9th Cir.1998) (internal quotation marks omitted). There are no grounds for judicial estoppel.

In *Meade*, the claimants demonstrated that they had moved to Eugene, Oregon, for employment based in part upon representations made by personnel employees during recruiting that, *inter alia*, the facility was growing, sales were up, the company was hiring more people, and the company was stable. Though the personnel employees at the Eugene facility did not know it, Cedarapids had almost completed a series of transactions that would lead Cedarapids to close the Eugene facility. We held that, under Oregon law, the "mere nondisclosure of material facts can be a form of misrepresentation where the defendant ... has made representations that would be misleading without full disclosure." *Id.* Because the plaintiffs had "adduced sufficient evidence" to prove their claim that defendants had either already reached or nearly reached a decision on the closure of the Eugene plant, *id.* at 1221–22, we reversed the district court's grant of summary judgment. Our decision in *Meade* concluded that Oregon law had previously established the principle that the failure to disclose that the facility where the plaintiffs relocated to work might close was, in that case, a failure to disclose a "likely material contingenc[y]." *Id.* at 1222. So far as we have been able to discern, no Oregon appellate case after *Meade* has criticized it, nor has the Oregon Supreme Court ruled in a way that would undermine its conclusions. We continue to accept *Meade* as a correct statement of Oregon law.

Applying *Meade's* principle here, the district court held that, when the Position was offered to Arboireau, Mignano had no "reason to believe that it would move to Germany within two or three years" and that "Mignano had no reason to know that [Arboireau] would not agree to move to Portland for less than two or three years." The district court reasoned that while Arboireau was being recruited there was no decision made to move the Position.[11] The district court distinguished *Meade* by noting that "Mignano made no assurances ... of job security" and "Mignano had no reason to know in the fall of 1999 that the Position would be moved to Germany in less than two or three years since no reorganization plan was then in progress." The district court's holding might have been correct if: (1) Appellees made no representations; (2) the information withheld was not material; or (3) the relocation of the Position to Germany was not sufficiently likely. Based on the need in this summary judgment context to accept Appellants' evidence and to give all reasonable inferences to Appellants, we conclude that none of the above points is conclusively established by Appellees and that genuine issues of material fact remain.

▮ First, although the district court was correct that no assurances of job security were given, a rational jury could conclude that Mignano's constant request for a minimum commitment of 24 months (with a preference for three years) made an implied[12] representation of locational

11. The district court also highlights that Shorrock [Arboireau's supervisor at the time of the firing], not Mignano, actually fired Arboireau. From this, the district court concluded that Appellants would have "to prove the existence of a conspiracy between Bennet [the person who made Shorrock Arboireau's supervisor], Shorrock or Mignano" regarding the precise order of future events leading to Arboireau's termination. This view is not supported by the Oregon law permitting a misrepresenta-

tion claim when a "likely material contingency" is not disclosed.

12. Representations in Oregon can be implied. *Ogan v. Ellison*, 297 Or. 25, 682 P.2d 760, 765 (1984). The fundamental character of fraud is "the communication of a misimpression." *Williams v. Philip Morris Inc.*, 182 Or.App. 44, 48 P.3d 824, 832 (2002), *vacated and remanded on other grounds*, —— U.S. ——, 124 S.Ct. 56, —— L.Ed.2d —— (2003). Even if the statement is literally true, it can be a

stability; i.e., the Position would remain in Portland for the next two to three years. *Meade*, in a similar situation, held that although the Cedarapids employees were at-will, the employees "were not relying on representations as to the duration of their employment. Plaintiffs accepted at-will employment, but they accepted at-will employment with a company that represented its Eugene facility as growing while failing to disclose and/or concealing that it was closing." *Id.* at 1223.[13] A jury could find that Mignano made implied representations about the future location of the Position and that the representations were misleading without disclosure of the pressure to move the Position to Germany, notwithstanding that Arboireau had "no reasonable expectation[ ] for employment of any particular duration." *Id.*

Second, Arboireau is not required to prove that Mignano had reason to know that Arboireau would not move to Portland for less than two years to meet the materiality requirement. In Oregon, for a contingency to be material, requiring disclosure, the contingency, standing alone, need not be shown to be determinative in the plaintiff's decision-making. Stated another way, Oregon law does not require that the plaintiff need go so far as to show that "but-for" the non-disclosure, the plaintiff would have made a different decision. Instead, what is required is a showing that disclosure of the contingency was likely to affect the conduct of a reasonable person

in Arboireau's position. *See Hampton v. Sabin*, 49 Or.App. 1041, 621 P.2d 1202, 1207 (1980) (holding that a misrepresentation is material if "it would be likely to affect the conduct of a reasonable man with reference to a transaction with another person") (internal quotation marks omitted); *Campbell v. Southland Corp.*, 127 Or.App. 93, 871 P.2d 487, 492 (1994) (en banc) (same). We conclude that, on this record, giving all inferences to the Appellants, the stability of the position was a paramount concern to the Arboireaus: Arboireau would not have accepted, and Arboireau's spouse would not have encouraged him to take, the Position if either had known of the pressure to move the Position to Germany. Mignano knew of the importance of locational stability to the Plaintiffs. Non-disclosure of a likely risk to this factor important to the Plaintiffs' decision-making process meets the Oregon materiality standard. *See Caldwell v. Pop's Homes, Inc.*, 54 Or.App. 104, 634 P.2d 471, 477 (1981).

Third, the district court's view that this claim could not proceed in the absence of evidence of a completed or nearly completed reorganization plan is an unduly narrow interpretation of the requirement that a material contingency be "likely." Appellants submitted evidence from which a rational jury might have concluded that relocation of the Position was highly possible, if not probable, given the "constant pressure" to relocate that existed from at least September 1999 until the Position relocated.[14]

---

misrepresentation if the statement creates a false impression under the circumstances. *Heverly v. Kirkendall*, 257 Or. 232, 478 P.2d 381, 382 (1970). Thus, Mignano's constant requests for a two to three year commitment may have created the misimpression of locational stability. A jury is well equipped, on proper instruction, to determine whether an implied representation was made.

**13.** This holding was a rejection of the conclusion of the district court under review in

*Meade* that, by agreeing to employment at-will, the claimants were not justified in relying on the pre-employment representations. *Meade*, 164 F.3d at 1223. This holding, however, applies equally to the claim that employment at-will precludes representations of locational stability in the first instance.

**14.** In addition to Mignano's testimony about constant pressure, the record shows that Pollard (Arboireau's replacement) told him in February 2000 that "there is a lot of pressure

In *Caldwell,* the court held that nondisclosure of the possible sale of a mobile home park was actionable even though "[a]t the time plaintiff bought the mobile home, the sale of the park was simply pending and, in fact, might never have occurred" because the purchaser held an option contract for the park. 634 P.2d at 477; *see also Elizaga v. Kaiser Found. Hosps., Inc.,* 259 Or. 542, 487 P.2d 870, 873 (1971) (holding that non-disclosure that a position "probably" or "might well" be terminated by the state medical board before the end of the implied term of employment was a misrepresentation). If an outstanding option contract is sufficient to meet the likely material contingency standard, then constant pressure from within the Appellees to relocate the Position is also sufficient evidence for a jury to find a likely material contingency. Viewing the evidence in a light most favorable to the Appellants, the Appellants' contention that the Appellees intentionally misrepresented the locational stability of the Position, which under *Meade* was a material contingency for the Arboireaus, in our view warranted submission to the jury.[15]

A rational jury, on this evidence, might find, by clear and convincing evidence, that each element of this intentional misrepresentation theory had been proved, and thus, summary judgment was inappropriate. The Arboireaus are entitled to present to a jury at trial their claim that Defendants intentionally misrepresented the locational stability of the Position and misled the Arboireaus to their detriment. We have affirmed the district court in part on the judgment dismissing the breach-of-contract claim and dismissing the claim that job duration was misrepresented. However, we reverse in part and instruct the district court, on remand, to conduct such further proceedings as may be appropriate, consistent with this opinion, while permitting Appellants to proceed to trial on their claim of intentional misrepresentation of the Position's locational stability.

The parties shall bear their own costs on appeal.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

---

to have your job in Germany," that employees in the German headquarters wanted the Position moved, and that a "lot of people" favored relocation. Arboireau himself recognized the logic of having the position in Germany after beginning work. Considering the evidence presented, and reasonable inferences from it, in a light most favorable to Appellants, a jury might conclude that this pressure existed when Arboireau was recruited, when he negotiated with Mignano, and when he first began working in the Position.

15. Although there was no extended discussion by the parties or the district court of the other elements of the intentional misrepresentation claim, based on the record provided in this case, we hold that there is a disputed issue of material fact with respect to each element. *Cf. Graves v. City of Coeur D'Alene,* 339 F.3d 828, 846 n. 23 (9th Cir.2003) (stating that the Court may affirm the district court on "any ground supported by the record"). For example, there is evidence of Defendants' incentive to quickly induce Arboireau to take the job, providing sufficient evidence for the intent requirement.